[Crim. No. 2180. Second Appellate District, Division Two.—August 25, 1933.]

THE PEOPLE, Respondent, v. HAROLD G. FERGUSON, Appellant.

Frank P. Doherty and Bourke Jones for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

STEPHENS, J.—The court, sitting without a jury, found the appellant Harold G. Ferguson guilty of grand theft in

counts 2 to 6, inclusive; 11, 12, 17, 18, 19, 22 to 25, inclusive, 29 and 30, and guilty of violating the Corporate Securities Act (Stats. 1917, p. 673), in counts 34 to 43, inclusive, excepting count 41, all charged in a grand jury indictment. (For convenience we use Arabic instead of Roman numerals as used in the indictment and as sometimes used in the briefs.) The issues of this appeal will be better understood after the reading of the following quoted portion of the trial court's able narrative as unfolded by the evidence:

"In the year 1927 the defendant Ferguson was engaged in the real estate business in the City and County of Los Angeles and, having handled various realty transactions through the medium of syndicate trusts, conceived the idea of a revolving trust, by means of which comparatively small investments of a relatively large number of persons would be combined in a trust organization with a banking institution acting as trustee, and Mr. Ferguson, through his *alter ego*, the Harold G. Ferguson Corporation, acting as trust manager. Pursuant to this plan conceived by Mr. Ferguson, a trust was organized naming the Pacific National Bank as trustee and the Ferguson Corporation as trust manager, which trust, capitalized for $250,000.00, became known as P.T. (Private Trust) No. 27. This was in the month of February. The interests of the subscribers to such trust were evidenced by documents called certificates of beneficial interest, and it is around the sale of these certificates of beneficial interest in P.T. 27 and in other revolving trusts, which were thereafter organized, that most of the charges in this case arise. The sale of such beneficial interests in P.T. 27 proceeded slowly at first.

"Mr. Ferguson has been a resident of Los Angeles for some 38 years, was educated in this state and admitted to the bar, and practiced law here, [and] occupied various official and civic positions. . . . He served with distinction during the World War and thereafter achieved an enviable and outstanding position in the community both commercially and socially. [In 1927] Mr. Ferguson acquired a controlling interest in the Wimsett System Corporation, and Mr. Luckey (a codefendant) and one Lloyd Bergman became owners in equal shares of the minority interest. Mr. Luckey acquired no interest in the Ferguson Corporation, and at no time was employed by it, although he was some-

times referred to as the manager of the finance or securities department thereof. Mr. Ferguson was made president and manager, and Mr. Bergman secretary and treasurer of the Wimsett System Corporation, and such organization began to build up a sales force for the purpose of marketing the certificates of beneficial interest in revolving trusts to be created by Mr. Ferguson. Thereafter, in October, 1927, a $1,000,000 trust, known as P.T. 50 was organized, and the following year Trust 33, a $5,000,000 trust, and Trusts 999 and 1013 were organized. Trusts 27, 50 and 33 were advertised as being organized for the purpose of buying and selling real estate in California; Trust 999 was authorized to deal in both real and personal property, and 1013 confined its activities to one particular tract of land known as a portion of the Rancho Malibu La Costa. These five trusts, which have been described, are the only ones with the sale of whose interests to the public we are directly concerned, but some of them dealt somewhat extensively in interests in certain other trusts, which it will be necessary for us to mention. Chief among the latter are S–6638, frequently referred to as the Canoga, No. 3070, known as the Palm Ranch, and Nos. 5710 and 5411. Of these . . . the Canoga, S–6638, will occupy the most prominent part in our discussion. It comprised some thirty-six hundred acres of land, situated in Los Angeles County . . . [T]he shares therein were offered and sold to the public at the rate of one thousand per .08 interest, the declaration of trust, however, requiring the payment of only five hundred dollars per .08 interest to the trustee. This declaration of trust, by its own terms, declared that the interests of beneficiaries thereunder were purely personal in character and that the holders thereof acquired no interest in the lands or estates held in fee title by the trustee.

"Commencing in December, 1927, and continuing throughout practically the entire lives of Trusts 27, 50 and 33, such latter trusts were caused by the defendant, Ferguson, to purchase and sell, among other things, interests in said Canoga Trust. From its inception in 1927 until a time subsequent to March 1, 1929, the dealings of 27, so far as earning profits was concerned, were exclusively in interests in Canoga and, dealings in such interests, contributed either conclusively or substantially to dividends paid by 50 and 33.

In the latter part of the year 1930 all of the revolving trusts mentioned and also 1013 apparently came into sore financial straits and in the year 1931 went into receivership.

"In connection with the sale of certificates of beneficial interest in all the revolving trusts and in 1013, representations were made that Trusts 27, 50 and 33 were organized for the purpose and object of dealing in real estate and that the form of organization and methods employed in handling the business of all of said trusts provided a high degree of safety, and much publicity was given to the dividends paid by 27 and 50 which, although paid quarterly, averaged 1 per cent per month for more than a year and a half."

There is very little, if any, important item of fact disputed in the case. The evidence demonstrates that Ferguson, the master in actual charge of the several trusts, ordered the purchase and sale of interests from one to another without regard to their market value and with regard only to the payment of unearned profits. We here set out four letters all signed in the same way, as examples of the manner in which the manipulations took place:

To Pacific National Bank under date of December 28, 1927:

"Gentlemen:

"Please be advised that Harold G. Ferguson Corporation as managing director of your Trust P.T. 27 has authorized you to purchase certain certificates of beneficial interest Trust No. S–6638, Title Insurance and Trust Company of Los Angeles, being a subdivision held by that title company.

"The purchase of said units amounts to the sum of $2,300.00, representing six units of 1/800th interest in the above mentioned trust. These units were purchased in the following manner:

"2 units, 1/800th interest at $1,000.....$2,000
"4 units, 1/800th interest at      75.....   300

"Total..................2,300
"Yours very truly,
"HAROLD G. FERGUSON CORPORATION,
"by HAROLD G. FERGUSON,
"J. MURRAY MORGAN."

Under the same date a similar letter referring to trust 50 was sent to the trustee. We quote the essential part:

"The purchase of said units amounts to the sum, of $20,700.00 representing certain 34 units of 1/800's interest in the above mentioned trust. These units were purchased in the following manner.

"Twenty units of 1/800's interest at $1000.00, $20,000.00; fourteen units 1/800's interest at $50.00, $700.00, total $20,700.00."

The following letter, under date of February 29, 1928, was sent to the trustee:

"Enclosed herewith find six checks payable to yourselves totaling $2250.00 covering three sales by Wimsett System Corporation of beneficial interests in Trust S–6638, Title Insurance and Trust Company of Los Angeles, said money to be credited as follows:

"R. R. Chappell, 1/800th; Original purchase price 1/800th interest, $75.00; Net profit on sale 1/800th interest S–6638, credit profit account P.T. 27, $675.00.

"R. C. A. MacPhail, 1/800th; Original purchase price 1/800th interest, $75.00; Net profit on sale 1/800th interest S–6638, credit profit account P.T. 27, $675.00.

"Howard F. Murchie, 1/800th; Original purchase price 1/800th interest $75.00; Net profit on sale 1/800th interest S–6638, credit profit account P.T. 27, $675.00.

"Six checks enclosed as above enumerated totaling $2250.00."

Under date of June 9, 1928, the following letter was sent to the trustee:

"Under date of May 29th this corporation handed you checks for $750.00 to cover sale of beneficial interests in Title Insurance & Trust Company, Trust S–6638, to Harold G. Ferguson. Assignment form properly signed by Mr. Ferguson has also been handed you.

"You are hereby authorized and directed to make the assignment of beneficial interest in Title Insurance & Trust Co. Trust S–6638 to Harold G. Ferguson in the amount of 1/800th interest."

It would seem significant that the interests entered upon the trust books as purchased at a very low price were sold at great profit while those few purchased at par rating have never been sold.

■ The trial court's conclusion that this manipulation was done for no other purpose than to rate *Ferguson trusts* "interests" high in the markets is not only a reasonable one, but it would seem the only possible one. Of course, the false and forced high rate of return for money invested in them no more truly represented their value as investments than the assay of "salted" ore represented the value of a gold mine in other days. Counsel for appellant point out that their client forbade deception by the sales crew, but the evidence discloses that he personally appeared before the sales crew and delivered addresses on the subject of the business and stated to salesmen, and his lieutenants habitually did the same, that the money accumulated in the trusts from the sale of "interests" was and would be invested by the purchase of choice real estate. Appellant argues in his brief that the manipulated "interests" above referred to were interests in real estate trusts and were in fact real estate. The evidence is undisputed that the units thus purchased were in no sense titles to real estate. They were mere certificates that the holder would share *pro rata* in any profits resulting from the venture of others. We think these certificates are personal property. (*Title Ins. & Trust Co.* v. *Duffill,* 191 Cal. 629, at 642, 647, 649 [218 Pac. 14] ; *Ward* v. *Waterman,* 85 Cal. 506 [24 Pac. 930] ; *Craven* v. *Dominguez Est. Co.,* 72 Cal. App. 717 [237 Pac. 821].) However, we do not deem the point of decisive importance. Even were it conceded that the purchased units were real estate or were it conceded that appellant, in all good faith so regarded them, the real point remains. The transfers were not honest commercial acts. They were intentionally made to and did create an apparent but false and fraudulent income value upon Ferguson trust investments.

We cannot follow appellant's argument that the fraud cannot be imputed to him for the reason that he did not personally tell his salesmen to boost sales in one trust by representing what another trust had paid. A corps of salesmen were employed for no other purpose than to sell these "interests". Appellant's lieutenants and he himself lectured them at meetings. These lieutenants testified that they were not informed of the sale of properties. They knew of past dividends and of dividends contemplated in the future and they told these things to the sales force, who

in turn told them to prospects. The witness Luckey testified as follows:

"Always before a dividend period—I mean, before the trust was to pay a dividend a great many inquiries would come in as to when they were going to pay and how much they were going to pay; and those inquiries usually came in to my office, both by the salesmen, the sales managers, and a great many of the clients would call in; and I never could give them any information until Mr. Ferguson had told me; and they would vary; sometimes it would be a week before a dividend was going to be paid, and sometimes the day before; and these salesmen, particularly, and a great many clients were inquiring, and I would ask Mr. Ferguson, from time to time, after those inquiries were coming in, if the trusts are going to pay a dividend and how much; that I was getting a great many inquiries in; and when the time would reach back to the time when it was going to be, Mr. Ferguson would say: 'Trust 50' or 'Trust 27' or 'Trust 33' or whatever the trust might be, 'is going to pay a certain dividend'. The conversation led up to the time at which he announced it; and all he would say at the time was: *'Well, you can tell your salesmen, or your clients, or sales managers, that it is going to pay so much.'*" (Italics ours.) Tom Dalton, a sales manager, testified much the same as Luckey on this point.

Presumption of innocence is a precious right; criminal convictions cannot be based upon mere suspicion; but society's arm to curb crime is weak indeed if logical inference which would seem next to demonstration itself in any other civilized endeavor cannot be indulged in the detection of crime. The evidence is conclusive that the purchases alleged in all of the counts upon which conviction was had, with the exception of count 3, resulted from the fact that certain Ferguson trusts had been fraudulently manipulated to show very large returns. In truth and in fact they had not paid except fraudulently and the showing made had no relation to the future possibilities of any of the Ferguson trusts. Every such sale was fraudulent. Every conviction based thereon must be sustained unless certain points raised by appellant are to be resolved in his favor. We proceed to consider them.

As a result of the booming of returns on 27, 50 and 33 and of the payment of heavy returns being communicated to them by salesmen, complaining witnesses in counts charging grand theft purchased interest in other Ferguson trusts. Appellant contends that these trusts were each independent of the other and that the testimony as to profits and how they were arrived at are collateral matters of no materiality in the counts of the indictment. We have already made it clear that we think the evidence supports our conclusion that *Ferguson trusts* were intentionally made attractive by the fraudulent method of declaring large returns on some of the trusts in order to induce the sale of interests in others. Appellant cannot be sustained on this point. (*People* v. *Martin,* 102 Cal. 558 [36 Pac. 952], and *People* v. *Weir,* 120 Cal. 279 [52 Pac. 656].)

Appellant makes the point that the conviction of grand theft by false pretenses cannot be sustained because the purchases of interests in trusts other than 27, 33 and 50 were made through reliance upon promises of future profit. This, we think, is conclusively answered by the preceding paragraph herein. (*People* v. *Wasservogle,* 77 Cal. 173 [19 Pac. 270].)

Appellant argues that the case of false pretenses is not made out for the reason that the buying and selling of the beneficial interests by, into and out of the several trusts was not disclosed to the complaining witnesses and amounts to nondisclosure if anything, and therefore does not support the offense of false pretenses. The false pretense was that *Ferguson trusts* purchasing real estate had made great profits and others would do the same. The whole inducing argument was this false pretense. In our opinion the evidence is sufficient to support conviction of grand theft by false pretenses.

Appellant contends there is lack of corroboration but the facts do not support him. The evidence establishes that the purchases were made because of the belief of great profits in *Ferguson trusts.* These profits were induced by fraud, amounting to false pretenses, or, if you will, by means of trick and device. All of this is corroborated by the evidence establishing the whole structure of the scheme; the orders of Ferguson to transfer the interests; the publicity of the

large returns on certain trusts; Luckey's testimony of the representations as to profit by the salesmen and Ferguson's own statements to his sales managers and crew. (*People* v. *Harrington*, 92 Cal. App. 245 [267 Pac. 942], and cases there cited; *People* v. *Hennessey*, 201 Cal. 568 [258 Pac. 49].)

Appellant argues in his brief that even if misrepresentations were made, he did not authorize them. Whether appellant specifically authorized the representations or not is not the whole question. In *People* v. *Epstein*, 118 Cal. App. 7, 10 [4 Pac. (2d) 555, 556], it is said: "The general rule is that where the crime charged involves guilty knowledge or criminal intent, it is essential to the criminal liability of an officer of the corporation that he actually and personally do the acts which constitute the offense, or that they be done by his direction or permission. (*State* v. *Thomas*, 123 Wash. 299 [33 A. L. R. 781, 121 Pac. 253] citing cases.)" The evidence permits of no other conclusion than that appellant knew of the misrepresentations generally and intended that they should be made for the purpose of inducing sales. But even if the evidence does not directly connect appellant therewith the circumstances are such as to make such inference as dependable as the direct testimony could itself do.

The point is made that conviction under count 12 cannot be sustained because the representations were not made to induce the complaining witness to buy but to teach him to sell. He was one of the crew of salesmen. The representations were as a seine spread to catch all who heard and believed. That one so closely associated should be deceived shows how convincing the representations were. The evidence is sufficient to show that the purchaser of interests as alleged in each count made the purchase upon representations to him by a salesman or sales manager of Ferguson interests of the large profits made on 27, 50 and 33, and that the same or similar results would follow in the other trusts formed and handled under Ferguson management for the same kind of business.

We think the evidence amply supports the convictions upon either theory of false pretenses or larceny by trick and device. (*People* v. *Hennessey*, *supra*.)

■ As to count 3, the testimony regarding the inducing representation as to payment of a dividend refers to trust 50, and the investment of $1,000 in that trust. Later the witness said he invested in trust 33 instead of 50, but made no correction as to the inducing representation. It would seem clear that the testimony does not support the judgment of conviction.

The counts of the indictment under the Corporate Securities Act.

As to counts 34 and 43, inclusive, charging violation of the corporate securities act, it is the position of appellant that the sale of interests in trust 1013 (Malibu) did not legally require the consent of the corporation commissioner and that even if it did technically, that appellant could not be guilty because he was advised by the commissioner that it was not legally necessary to secure permits.

■ The land was to be acquired by the investment of money through the medium of proportional "interests". The money received from the sale of interests was to be paid to a trust company and be used by it in conjunction with the purchase of the land, its improvement and for certain expenses. The title to the real estate was not in the interest holders and, indeed, those investing in interests acquired little or no other right than the right of participation in profits from the sale of lots in the real estate purchased. We think the "interests" were securities under the reasoning in *People* v. *Oliver,* 102 Cal. App. 29 [281 Pac. 813, 817], and authorities cited therein; also under *Agnew* v. *Daugherty,* 189 Cal. 446 [209 Pac. 34], and *People* v. *Leach,* 106 Cal. App. 442 [290 Pac. 131]. The "interest" in the instant case responds in every way to the definition of a security which we quote from the Oliver case: "If the instrument of sale creates a present right to a present or a future participation in either income, profits or assets of a business carried on for profit it is a 'security' as defined in the Corporate Securities Act."

■ Upon the point that appellant was not guilty of violating the corporate securities act because he had been advised in other similar cases by corporation commissioner deputies and by the corporation commissioner directly in this instance that no permit was necessary, counsel for appellant made an offer of proof as follows:

"Mr. Doherty: We offer to prove by this witness that, beginning with the year about 1922, while he was a trust officer of the California Trust Company and thereafter in and about his business in handling and dealing in real estate and trusts, that he, as such trust officer, and as an officer of the Harold G. Ferguson Corporation, and as an individual, had occasion to use and did use trusts, declarations of trust similar in provisions and legal effect to the terms of 1013; and that during that period he, at various times, talked with officials of the corporation department of the state of California for the purpose of determining from them whether or not it was a trust which could be classified as a security or as real estate; and that he was advised by the deputy corporation commissioners and by the assistant commissioner that their construction of the act was that it was not a security, and that he need not get from the department a permit or license to sell the stock or interests, or beneficial certificates; and that as late as 1929, the then corporation commissioner, Mr. Athern, had stated that when the particular trust 1013 was executed, he had stated that his department had investigated that trust, had personally examined it, and that it was his opinion that under the act as he construed it a permit was not necessary. That is our offer of proof."

The district attorney submitted his objection that the proposed proof was immaterial and irrelevant and the objection was sustained. We think this was error. It is no doubt true that advice of counsel will not excuse the offense. It is true that "ignorance of the law excuses no man" although we are not prepared to say that this old maxim stands undefiled by exception. It is true generally that where the act is knowingly and wilfully done the act imports the intent. (*People* v. *O'Brien,* 96 Cal. 171 [31 Pac. 45], which case we had recent occasion to consider; see *People* v. *Ferguson,* 129 Cal. App. 300 [18 Pac. (2d) 741].)

However, it occurs to us that a different situation is here presented. The regulation which has not been complied with is *malum prohibitum* and not *malum in se.* It covers one of the most complicated phases of modern commercial life. The statute can be read strictly or liberally, according to the type of mind applied to it. It is under the administration of the commissioner and his decisions in most cases

are final. If the appellant early in his real estate career found himself in honest doubt, notwithstanding his high education and legal accomplishments, went to the fountain-head itself for information and was there advised that such organizations were not under the department's jurisdiction, and if after he had this identical organization ready to launch, he went to the corporation commissioner himself and was advised in the same manner, we cannot believe the law so inexorable as to require the brand of felon upon him for following the advice obtained. The mere statement of the facts demonstrates that such strict construction would be unconscionable and more calculated to engulf the innocent law-abiding business man than to punish the guilty or to protect the security buyer. By the very attitude of the corporation commissioner's office, assuming, of course, that the proof would have been as strong as the offer of proof, appellant was forced to sell the securities in question without a permit or not to sell them at all. Such a state of affairs is not imaginable, for, as we have seen, the sale of such securities is not *malum in se.*

The evidence outlined in the offer was neither immaterial nor irrelevant and should have been received. In connection with this point the fact that appellant had much business with the corporation commissioner and secured permits to sell securities in the several other trusts would seem to open the way for an explanation of why none was obtained for this particular one. After all, neither the law nor its application can be reduced to thumb rule and the application of rules should ordinarily cease where the reason back of them fails. The illegal manner in which appellant sold the securities in some of the trusts herein referred to should not be confused with the wholly legal organization of such trusts. His guilt in the one incident must not deter us from declaring his complete innocence in the other.

The case of changing a public record, as in the O'Brien case or of the possession of metal knuckles as in the A. L. Ferguson case, were instances of knowingly doing that which the law prohibits. In such instances the act imputes the intent. In the instant circumstance the act does not impute intent. The principle which we are here considering is variously expressed under different circumstances in the following cases: *State* v. *Freeland.* 318 Mo. 560 [300 S. W.

675], *United States* v. *Jackson,* 280 U. S. 183 [50 Sup. Ct. 143, 74 L. Ed. 361], *State* v. *Cutter,* 36 N. J. L. 125, *State* v. *Gardner,* 5 Nev. 377, and *State* v. *O'Neil,* 147 Iowa, 513 [126 N. W. 454, Ann. Cas. 1912B, 691, 33 L. R. A. (N. S.) 788].

It is not, we think, out of place to commend the manner in which this appeal has been handled. The points have been presented for appellant in a clear and orderly manner and have been met by the state in the same way. The case is a complicated one, with testimony extending through 4,799 typewritten pages and the able presentation here commended has been of great assistance to us.

The judgment and order denying a new trial are reversed as to counts 3 and 34 to 40, inclusive, and 42 and 43, and affirmed as to all of the other counts upon which conviction was obtained.

Works, P. J., and Craig, J., concurred.

Petitions by appellant and respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, were denied by the Supreme Court on September 27, 1933.

Thompson, J., deeming himself disqualified, did not participate herein.