[L. A. No. 21956. In Bank. Oct. 21, 1952.]

RICHFIELD OIL CORPORATION (a Corporation) et al., Appellants, v. WALTER M. CRAWFORD et al., Defendants and Respondents; MAURICE HENDERSON et al., Interveners and Respondents.

Cree & Brooks, John Brooks, Marlon F. Schade, Griffith & Thornburgh, C. Douglas Smith, O'Melveny & Myers, Jackson W. Chance and Rodney K. Potter for Appellants.

Everett S. Layman, Kenneth S. Carey, Howard H. Bell, Richard E. Tuttle, Lawrence L. Otis and James F. Healey, Jr., as Amici Curiae on behalf of Appellants.

Joseph A. Ball, Clark Heggeness, Ball, Hunt & Hart, Schauer, Ryon & McMahon, Thomas M. Mullen and Harry E. Templeton for Interveners and Respondents.

Arthur C. Fisher, Overton, Lyman, Prince & Vermille, Donald H. Ford, Faries & McDowell, McIntyre Faries and Wayne R. Hackett as Amici Curiae on behalf of Respondents.

TRAYNOR, J.—This appeal involves the interpretation and application to certain parcels of land of section 3600 of the Public Resources Code regulating the spacing of oil and gas wells. The accompanying diagram shows the relationship of the parcels and the wells thereon.

All oil wells are producing from the Colgrove formation in the Cuyama oil field. The dotted line across the diagram represents the Hadley-Stone fault, running in a northwest-southeast direction. This fault acts as a barrier to oil and gas and thus limits production to that portion of the Colgrove formation north and east of the fault.

All of the property is owned by H. S. Russell. In 1945 he leased the property to the Norris Oil Company. Subsequently in 1945, Norris subleased parcels two and three to predecessors in interest of plaintiff Richfield Oil Corporation. In 1947 Norris subleased parcels one and four to Carpenter and Henderson, plaintiffs in intervention. In 1948 Carpenter and Henderson subleased parcels one and four to Anderson

Associates who in turn assigned an undivided half-interest therein to Richfield. Shortly thereafter Anderson Associates and Richfield quitclaimed all their interest in parcel four to Carpenter and Henderson. In June, 1949, Carpenter and Henderson subleased parcel four to defendants Crawford and Hiles. Since July 25, 1949, defendants have been producing oil from Well 1. The surface location of this well is more than 200 feet from the boundaries of parcel four, but its producing interval or bottom is in oil producing land northeast of the fault, less than 100 feet from the boundaries of defendants' property. Richfield is sublessee under oil and gas leases for parcels one, two, and three, and is producing oil from Wells 88, 187, 18 and 11 on those parcels.

Richfield sought to enjoin operation of Well 1 and recover damages for its past operations on two theories: that the well was operated in violation of Public Resources Code, section 3600, and that it constituted a subsurface trespass on Richfield's property. In a third action Richfield sought a declaration as to the location of the boundary between the parcels in relation to the subsurface location of Well 1. Plaintiffs in intervention, Carpenter and Henderson, sought declaratory relief to have their rights declared respecting royalty interests in Well 1. The trial court denied Richfield injunctive and monetary relief, declared that the well was entirely within defendants' property, and declared that Carpenter and Henderson owned 23 per cent of the production of Well 1 and that Richfield had no interest therein. Richfield appeals from the judgment.

### Construction of Section 3600

Section 3600 provides that "any well hereafter drilled for oil or gas, or hereafter drilled and permitted to produce oil or gas, which is located within 100 feet of an outer boundary of the parcel of land on which the well is situated, or within 100 feet of a public street or road or highway dedicated prior to the commencement of drilling of the well, or within 150 feet of either a well being drilled or a well theretofore drilled which is producing oil or gas or a well which has been drilled and is not producing but which is capable of producing oil or gas, is a public nuisance." Richfield contends that Well 1 is a public nuisance, on the ground that it "is located within 100 feet of an outer boundary of the parcel of land on which the well is situated." Richfield concedes that the surface location of Well 1 is more than 100 feet from the boundary,

but contends that the statute is violated when the producing interval of a well is less than 100 feet from the boundary. Defendants contend that section 3600 restricts only the surface location of oil wells and does not apply to the producing intervals thereof.

Richfield urges that "well" is commonly understood to mean the entire shaft from the surface of the earth to the oil pool below and that in oil leases "boundary" usually includes "underground boundary." (See *Federal Oil Co.* v. *Brower*, 36 Cal.2d 367, 370 [224 P.2d 4].) Defendants urge on the other hand that the word "located" usually refers only to wells on the surface of the ground (see *Union Pac. R.R. Co.* v. *City of Los Angeles*, 53 Cal.App.2d 825, 829 [128 P.2d 408]) and that the words "on which the well is situated" indicate that the statute regulates wells "on" a parcel as opposed to wells "in or under" a parcel. (*Cf. Richter* v. *Adams*, 43 Cal. App.2d 184, 187 [110 P.2d 486].) ■ The word "well," or any other word in section 3600, cannot be disassociated from its context or the oil well spacing legislation as a whole. Thus, in section 3602 the context shows that "well" means the surface location, for the phrase therein "placed as to be as far from the lateral boundary lines of the parcel of land as the configuration of the surface and the existing improvements thereon will permit" could have no reference to the entire length of the shaft. Our inquiry into the proper interpretation of section 3600 cannot be guided solely by the dictionary meaning of each word standing alone; we must consider the well spacing legislation as a whole to determine the meaning of section 3600. (*People* v. *Moroney*, 24 Cal.2d 638, 642 [150 P.2d 888]; *Myers* v. *Alta Construction Co.*, 37 Cal.2d 739, 742 [235 P.2d 1].)

■ Comparison of section 3600 with other sections of the well spacing legislation supports defendants' interpretation. Thus section 3606, providing for the location of wells when the surface of the land is unsuitable for drilling, permits slant drilling into a parcel containing an acre or more when all or substantially all of the surface of such parcel is unsuitable for surface location of a well. This section also provides that in such cases the producing interval must be located not less than 75 feet from the outer boundary of the parcel into which it is drilled and that the surface location must be not less than 25 feet from the outer boundary of the parcel into which it is drilled. Section 3606 finally provides that

"to enforce the provisions of this section" the State Oil and Gas Supervisor may require the operator to make a subsurface directional survey of the well and to file a plat of such survey with the supervisor, which is open to public inspection.

■ Section 3600, however, does not provide that a subsurface survey may be required by the supervisor. Under Richfield's interpretation, although the Legislature has given the supervisor ample power to enforce part of the well spacing legislation, it fails to provide him with one of the most effective means of discovering violations of another part thereof.[1] If the Legislature intended enforcement of section 3600 to be left to action by private parties (as in the present case), difficulties remain. Section 3606 provides that the subsurface survey "shall be open to inspection by any other operator in the field in which the well is located." Section 3600, however, does not similarly protect adjoining landowners. Since sections 3600 and 3606 were reenacted together in 1947, it is difficult to believe that the Legislature would provide such contrasting enforcement procedures if it intended both sections to apply to subsurface locations of oil wells. ■ "Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed." (*People* v. *Valentine*, 28 Cal.2d 121, 142 [169 P.2d 1].)

An interpretation of section 3600 as applying only to the surface location of wells is supported by the administrative interpretation of that section since its enactment in 1931. The trial court admitted the deposition of R. D. Bush, State Oil and Gas Supervisor. It appears therein that from 1931 to 1945 his office interpreted section 3600 as applying only to surface locations of oil wells. Before any well was drilled or deepened, a notice of intention to drill was filed. (Section 3203.) If the surface location of the proposed well was within 100 feet from the boundary of a parcel of property, the supervisor served a notice of disapproval on the operator and, if drilling continued in disregard of the disapproval,

---

[1] The supervisor could obtain a subsurface survey by exercise of his investigative powers under section 3357. That section, however, requires complicated legal proceedings after the supervisor suspects that a well has been drilled in violation of the code; section 3606 allows him to require a survey at the time he gives approval of the notice of intention to drill.

the supervisor requested the attorney general to abate the well as a public nuisance. During this period of 14 years the supervisor did not make any investigation regarding the location of the producing interval of wells. In 1945, section 3606 was added to the code and thereafter the supervisor required all operators wishing to drill wells under that section to include in their notices of intention to drill a statement of the proposed bottom hole location, and also required the filing of subsurface directional surveys. When wells were not drilled under section 3606, the policy remained the same as that since 1931. In 1947, section 3608 was added to the code and the other sections were reenacted. The policy of the supervisor remained unchanged.

It thus appears from the record that during the 19 years preceding trial of this action section 3600 was consistently interpreted by the supervisor as applying only to the surface location of wells. ██ "[T]he contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such interpretation unless it is clearly erroneous or unauthorized." (*Coca-Cola Co.* v. *State Board of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1] ; *Holloway* v. *Purcell,* 35 Cal.2d 220, 226 [217 P.2d 665] ; *Mudd* v. *McColgan,* 30 Cal.2d 463, 470 [183 P.2d 10] ; *Nelson* v. *Dean,* 27 Cal.2d 873, 881 [168 P.2d 16, 168 A.L.R. 467].) Since the supervisor has maintained a consistent administrative policy for many years, the oil industry in this state has undoubtedly relied upon that policy and expended substantial sums of money in the belief that the supervisor's interpretation of section 3600 is correct. ██ Although failure to enforce statutes of this state will not estop a state agency from their subsequent enforcement (*Caminetti* v. *State Mut. Life Ins. Co.,* 52 Cal.App.2d 321, 326 [126 P.2d 165] ; *cf. People* v. *Ferguson,* 134 Cal.App. 41, 53 [24 P.2d 965]), past administrative action is evidence of the limits of the power to act (see *Federal Trade Com.* v. *Bunte Brothers,* 312 U.S. 349, 352 [61 S.Ct. 580, 85 L.Ed. 881] ; *Pacific Tel. & Tel. Co.* v. *Public Utilities Com.,* 34 Cal. 2d 822, 831 [215 P.2d 441] ; 2 Sutherland, Statutory Construction [3d ed.] § 5106), particularly when a statute is reenacted without change in the light of a settled administrative interpretation. (*Mudd* v. *McColgan, supra,* 30 Cal.2d 463, ·471; *Nelson* v. *Dean, supra,* 27 Cal.2d 873, 882.)

Richfield contends that defendants have shown only a "mere failure to act," which is not enough to be an administrative interpretation, citing *Estate of Madison*, 26 Cal. 2d 453, 463 [159 P.2d 630]. In the Madison case, however, the agency had not taken any steps from which the administrative interpretation of the statute could be discovered. In the present case the supervisor has continuously taken affirmative steps to carry out the policy of the oil spacing legislation, according to his interpretation. When the surface location of wells violates section 3600, or the producing interval violates section 3606, proceedings are set in motion to have the well abated as a public nuisance. When the surface location of a well is beyond 100 feet of an outer boundary no investigation is made regarding the producing interval. Thus the supervisor has consistently indicated that he interprets section 3600 as inapplicable to the subsurface location of oil wells.

Richfield contends that the supervisor's interpretation should not be given any weight on the ground that he is not charged with the duty of enforcing section 3600. If the supervisor discovers that an operator is violating the well spacing statute (see §§ 3203, 3210, 3214, 3236, 3357, 3606), he either requests the attorney general to seek an injunction or the district attorney of the particular county to prosecute the offender for commission of a misdemeanor. (Pen. Code, § 372.) Thus, in practice the supervisor determines which operators are subjected to legal proceedings for violation of the well spacing statute[2] and he has the power to obtain enforcement of section 3600 according to his interpretation thereof.

To support its interpretation of section 3600, Richfield points out that one of the purposes of the well spacing legislation is conservation of natural resources, relying on the declaration of purpose contained in the 1947 reenactment: "Unless this act takes effect immediately, wells will be drilled in violation of the policy of this State expressed in these sections for the conservation of natural resources and the observance of safe and orderly oil field operations upon the

[2]For example, a recent decision of this court involving section 3608 (*Hunter* v. *Justice's Court*, 36 Cal.2d 315 [223 P.2d 465]) arose after the supervisor discovered an operator drilling a well in violation of the statute and asked the district attorney to prosecute him.

738

surface of the land and as a result of such violation large quantities of natural gas would be wasted to the air.'' ■ Prevention of waste of oil and gas is undoubtedly a matter of public concern, and this court has repeatedly upheld the legislative power to prevent such waste. (*Hunter* v. *Justice's Court,* 36 Cal.2d 315, 317-318 [223 P.2d 465], and cases cited therein.) ■ Richfield correctly asserts ''that the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation'' (*Rock Creek etc. Dist.* v. *County of Calaveras,* 29 Cal.2d 7, 9 [172 P.2d 863]), but that rule of construction is not controlling here, for it is not shown that waste of oil and gas will result under the interpretation of section 3600 urged by defendants. Spacing of wells at the surface as required by sections 3600-3608 will limit the number of wells that may be drilled to the source of supply and will thus carry out the purpose of oil conservation.

Had the Legislature intended section 3600 to apply to producing intervals, it would have been a simple matter to provide that a well's penetration of the producing formation must not vary from a vertical drawn from a properly placed surface location. (Compare Fla.Stat.Ann. c. 377, § 377.26; No.Car.Gen.Stats. § 113-393D.)

■ For the foregoing reasons we have concluded that the statute applies only to the surface location of oil wells. The judgment in favor of defendants on Richfield's first cause of action must be affirmed, since Well 1 does not violate section 3600.

### The Boundary Dispute

In its second cause of action, Richfield alleged that defendants had committed an underground trespass by drilling the producing interval of Well 1 under Richfield's property to the east of parcel four. At the trial Richfield and defendants differed as to the proper method of surveying the boundary between the properties involved. The trial court found that defendants' method was correct and that Well 1 was located entirely within parcel four.

At the time of the original lease from Russell, the owner of all the property involved in this litigation, to the Norris Oil Company in 1945, the property was described only by reference to northerly extensions of government section lines. The sublease of parcels one and four to Carpenter and Henderson in 1947 was based upon a reference to section num-

bers and was not described by metes and bounds.[3] In January, 1948, Norris subleased other portions of the property to Anderson Associates (Richfield's predecessor in interest) expressly excepting the Carpenter and Henderson lease by reference to government sections.

Subsequently, title companies refused to insure the location of the property on the ground that the descriptions were too uncertain. Russell, Norris, Richfield, and several sublessees entered into a boundary agreement on February 19, 1948, defining boundaries between the parties by reference to a base line, the southwest boundary of the Russell Ranch. Carpenter and Henderson were not parties to this agreement and it excepted their land, describing it by reference to government sections. On March 13, 1948, a number of sublessees executed a second boundary agreement, but, again, Carpenter and Henderson were not parties thereto.

On March 15, 1948, Carpenter and Henderson quitclaimed to Norris Oil Company all interest in the Norris lease except parcels one and four, describing these parcels by a legal description substantially identical with that used in the boundary agreements and describing the east boundary of the parcels as follows: "Beginning at a point . . . marked 'Cuyama Rancho C-No. 31' . . . thence N. 65°10′24″ West along said SW line . . . a distance of 2,877.60 feet; thence due North 13,295.04 feet to true point of beginning. . . ."[4] On April 20, 1948, Norris Oil Company gave Carpenter and Henderson a new sublease for parcels one and four, again using this "due north" description of the east boundary. The "due north" description was used again on June 22,

---

[3] The property was described: "The southeast quarter of the southeast quarter of Section 25, Township 11 North, Range 28 West; and the northeast quarter of the northeast quarter of Section 36, Township 11 North, Range 28 West; S.B.B. & M. The land described herein is unsurveyed and is based on a northerly extension of the southerly section lines; . . . and contains eighty acres, more or less."

[4] The full description provides: "Beginning at a point in the SW line of said Rancho at a 2-inch galvanized iron pipe 6-inches high in a mound of stones, brass-cap marked 'Cuyama Rancho C-No. 31', set by Gerald C. Fitzgerald, registered Civil Engineer, and shown on map recorded in Book 26, Pages 138 and 139 of Records of Surveys, Records of said Santa Barbara Co., thence N 65°10′24″ West along said SW line as established by said Gerald C. Fitzgerald and shown on said Records of Survey map a distance of 2,877.60 feet; thence due North 13,295.04 feet to true point of beginning; thence due West 1320 feet; thence due North 2640 feet; thence due East 1320 feet; thence due South 2460 feet to the true point of beginning, and containing eighty acres, more or less."

1949, when parcel four was subleased to defendants by Carpenter and Henderson.

The following diagram, not drawn to scale, indicates the property described by the "due north" terminology.

Richfield surveyed the legal description of the property by running the line 2877.60 feet along the boundary of the ranch established by Fitzgerald (the line "C-31" to "C-32") to point "A," and then turning an angle of 65°10′24″ on the transit at that point and surveying the line from "A" to "B," the true point of beginning for parcels one and four. This method, known as a basis of bearings survey, assumed for purposes of the survey that the southwest line of the ranch had a bearing of 65°10′24″ at point "A." Defendants' survey used the same method as Richfield to find the location of point "A." At that point, however, they surveyed the call "thence due North 13,295.04 feet to true point of beginning," by running the line "true north" in the same manner as the township boundary would have been surveyed under the description in the original sublease, i.e., based on an observation of the North Star. (See 5 Thompson on Real Property, § 2824.) Since the southwest line of the ranch did not actually have a bearing of 65°10′24″ at point "A," the dif-

ference of the two surveys at point "B" was approximately 11 feet, east and west.

The trial court permitted Richfield and defendants to present considerable extrinsic evidence regarding the proper method of surveying the "A" to "B" line. Substantial evidence supported the trial court's conclusion that defendants' method was correct. Dr. Thomas, a professor at the California Institute of Technology and president of the American Society of Civil Engineers in 1950, testified that good engineering practice required an astronomical observation to survey the "due north" call. Alfred Jones, chief engineer and surveyor of Los Angeles County for 10 years, stated that ordinarily a "due north" call should be run as "true north." R. V. Pearsall, a licensed surveyor since 1913, agreed with Thomas and Jones. Richfield called several experts who testified that the description should be surveyed by a basis of bearings method. This testimony created a conflict in the evidence, which was resolved in favor of defendants by the trier of fact.

The trial court properly admitted the extrinsic evidence. ▓ Surveyors and civil engineers, like other experts, may give testimony on questions involving matters of technical skill and experience with which they are peculiarly acquainted. (*Jenny Lind Co.* v. *Bower & Co.,* 11 Cal. 194, 197; *Byard* v. *Hoelscher,* 112 Conn. 5, 9 [151 A. 351]; *Dundalk Holding Co.* v. *Easter,* —— Md. —— [73 A.2d 877, 879]; *Gutha* v. *Roscommon County Road Com.,* 296 Mich. 600, 607 [296 N.W. 694]; *Zipf* v. *Dalgarn,* 114 Ohio St. 291, 295 [151 N.E. 174]; *Pennington* v. *Mixon,* 199 Ala. 74 [74 So. 238]; *Tacoma Bldg. & Sav. Ass'n* v. *Clark,* 8 Wash. 289 [36 P. 135]; *Burgess* v. *Healey,* 73 Utah 316, 318 [273 P. 968]; 7 Wigmore, Evidence [3d ed.], p. 87; 11 C.J.S., Boundaries, § 107, p. 703; contra: *Edwards* v. *Ritter Lbr. Co.,* 163 Va. 851, 857 [177 S.E. 841]; *Vaught* v. *McClymond,* 116 Mont. 542, 555 [155 P.2d 612].) ▓ The testimony is not accepted for the purpose of varying or contradicting the terms of the deed, but to aid the trial court in its difficult task of translating the words of the deed into monuments on the surface of the earth, in accord with accepted surveying practices. Thus, as early as 1858 this court held that surveyors could be examined on the question whether the professional practice in the community was to run a "north" call "true north" or "magnetic north", since without the extrinsic evidence

the court could not determine the boundary indicated by the words of the deed. (*Jenny Lind Co.* v. *Bower, supra.*)

The findings of the trial court, based on the conflicting expert testimony and its interpretation of the deed, are consistent with the boundary description in the deed. Unless other terms of a deed or admissible extrinsic evidence show that a different method was intended by the parties, a "due north" call should be surveyed on an astronomical basis. (*Anaheim Sugar Co.* v. *County of Orange*, 181 Cal. 212, 222 [183 P. 809] ; *Fratt* v. *Woodward*, 32 Cal. 219, 227 [91 Am.Dec. 573] ; *E. E. McCalla Co.* v. *Sleeper*, 105 Cal.App. 562, 569 [288 P. 146] ; *Gutha* v. *Roscommon County Road Com.*, 296 Mich. 600, 607 [296 N.W. 694] ; *Plaquemines Oil & Dev. Co.* v. *State*, 208 La. 425, 439 [23 So.2d 171].)

 The base line was properly surveyed along the line from "C-31" to "C-32" and not by use of the 65°10'24" bearing described in the deed, since the call to the known boundary line of the ranch prevailed over the call to its astronomical bearing. (*Wagnor* v. *Blume*, 71 Cal.App.2d 94, 101 [161 P.2d 1001].) There is no reason why the 65°10'24" bearing, rejected in locating point "A," must as a matter of law be used in surveying the remaining calls in the description. Richfield points out that in many cases a "due north" or "north" call has been surveyed on other than an astronomical basis (see *Currier* v. *Nelson*, 96 Cal. 505, 508 [31 P. 531, 746, 31 Am.St.Rep. 239] ; *Martin* v. *Lloyd*, 94 Cal. 195, 202 [29 P. 491] ; *Faris* v. *Phelan*, 39 Cal. 612, 613; *Green* v. *Palmer*, 68 Cal.App. 393, 401 [229 P. 876] ; *Gutha* v. *Roscommon County Road Com., supra*), but in each of the cited cases other parts of the deed or the findings of the court based on admissible extrinsic evidence required a rejection of the astronomical method of surveying the call. In the present case, substantial evidence supports the finding of the trial court that defendants' method of survey was correct.

The trial court admitted extrinsic evidence showing that by "due north" the parties to the boundary agreements meant that the call in the deeds should be surveyed only by a basis of bearings method. Richfield contends that this evidence requires reversal of the judgment, invoking another aspect of the parol evidence rule: that evidence of the circumstances surrounding execution of a written instrument is admissible to determine its meaning. (Code Civ. Proc., § 1860.) Carpenter and Henderson and defendants, however, were not parties to the boundary agreements, and it is not shown that

they had actual notice that Richfield and Norris Oil Company attached a particular meaning to the words "due north." The conduct of Carpenter and Henderson indicates that they believed that the "due north" description in the March 15th quitclaim deed was interchangeable with the government section description in the 1947 sublease. Although evidence of the negotiations preceding execution of the boundary agreements may be admissible as between the parties thereto (see *Woodbine* v. *Van Horn,* 29 Cal.2d 95, 104 [173 P.2d 17] ; *G. R. Holcomb Estate Co.* v. *Burke,* 4 Cal. 2d 289, 296 [48 P.2d 669] ; *Balfour* v. *Fresno Canal & Irr. Co.,* 109 Cal. 221, 226 [41 P. 876]), a special interpretation of the quitclaim deed could not be enforced against a party relying upon the words of the instrument and without knowledge of the meaning attached thereto by the other party to that deed. (See *Bennett* v. *Newell,* 266 Mass. 127, 132 [165 N.E. 27]; *Dick* v. *Goldberg,* 295 Ill. 86, 94 [128 N.E. 723] ; *Attorney-General* v. *Shore,* 11 Sim. 592, 631, 59 Eng.Rep. 1002, 1021; 9 Wigmore, Evidence [3d ed.], p. 207.) Thus, in the present case the expert testimony of surveyors and engineers showing the proper method of surveying the calls in the deed was admissible as against both parties to the deed, since they must be deemed to know that "technical words are to be interpreted as usually understood by parties in the profession or business to which they relate" (Civ. Code, § 1645), but evidence of the negotiations of the parties to the boundary agreements could not be admitted to the detriment of defendants, for it would be manifestly unjust to charge them with the secret interpretation of other parties after defendants had relied upon the ordinary meaning of the words of the instrument. (See *Davenport* v. *Davenport Foundation,* 36 Cal.2d 67, 72 [222 P.2d 11] ; *Brant* v. *California Dairies, Inc.,* 4 Cal.2d 128, 133 [48 P.2d 13].)

Richfield next contends that defendants' survey results in disregarding the calls of the deed. Part of this argument is based on the fact that defendants disregard the 65°10'24" bearing in determining the location of point "A" on the line from "C-31" to "C-32." Since Richfield locates point "A" by the same method as defendants, the argument is without merit. In the remainder of the survey, north from point "A" to point "B," and thence due west, due north, due east, and due south to point "B" again, it is clear that defendants' survey will describe a closed figure.

Richfield and amicus curiae California Land Title Association assert that the interpretation adopted by the trial court and affirmed in this decision will cloud titles and upset settled boundaries throughout the state. These fears are groundless. Our decision does not add anything to rules of law established in California as early as 1858. (*Jenny Lind Co.* v. *Bower, supra,* 11 Cal. 194, 197.)

The judgment in favor of defendants on Richfield's second and third causes of action is correct, since there was no error in the trial court's determination that defendants' method of surveying the description in the deed was proper.

Richfield appealed from the judgment as a whole, but makes no contention that there is error in that part of the judgment in favor of plaintiffs in intervention Carpenter and Henderson.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Spence, J., and Van Dyke, J. pro. tem., concurred.

Appellants' petition for a rehearing was denied November 17, 1952. Van Dyke, J., pro tem., sitting in place of Schauer, J.