Thomas E. ROBERTSON, Jr., As Trustee of the Farmer's Co-Op of Arkansas and Oklahoma, Inc.; Bob Reves; Frances Graham; Robert H. Gibbs, Individually; Robert H. Gibbs, as natural guardian of his minor children, Thomas A. Gibbs and Robert H. Gibbs, Jr.; and Robert H. Gibbs, as Trustee of the Muskogee Internal Medicine Group Profit Sharing Funds; and Bob Reves; Frances Graham; and Robert H. Gibbs as Class and Subclass Representatives, Plaintiffs.

v.

Jack E. WHITE; J.E.W., Inc.; Valley Feeds, Inc.; Gene Kuykendall and Fred Kuykendall, individually and d/b/a Kuykendall & Kuykendall a partnership; Oran Moody, Jr. and Michael O. Moody, individually and d/b/a Moody and Moody, a partnership; Arthur Young & Company; Harry C. Erwin; Billy Joe Cabaniss, Jr.; Joseph F. Drozal, Jr.; Charles M. Hanson; Hal Brewer; Truman O. Boatright; Hugh Winfrey, Jr.; M.V. Creech; Charles Bane; E.H. Pritchett, Jr.; Robert Plunkett; Ralph McClure; Jimmy Don Gooch; Jerry Metzger; W.J. Rimmer; Don Sebo; Joe Wayne Harris; James Willis; Dan Ray Core; Harold Davis; Jay Freeman; Jay Neal, Jr.; George Wagnon; Raymond (Jack) Clark; Carl Creekmore and Morril H. Harriman, Jr., individually and d/b/a Creekmore & Harriman, a partnership; E.J. Ball, Kenneth R. Mourton, and Stephen E. Adams, individually and d/b/a Ball, Mourton & Adams, a partnership; Kirit Goradia; Eddie Joe Smith; and John Does 1–20, Defendants.

Nos. 85–2044, 85–2096, 85–2155 and 85–2259.

United States District Court, W.D. Arkansas, Fort Smith Division.

June 10, 1986.

Gary M. Elden, John R. McCambridge, Kevin Waite, Christopher J. Doherty, Isham, Lincoln & Beale, Chicago, Ill., for plaintiff Thomas E. Robertson, Jr.

Robert R. Cloar, Fort Smith, Ark., for intervening plaintiffs Bob Reves; Frances Graham; Robert H. Gibbs, as Natural Guardian of His Minor Children, Thomas A. Gibbs and Robert H. Gibbs, Jr.; and Robert H. Gibbs, as Trustee of the Muskogee Internal Medicine Group Profit Sharing Funds; and Bob Reves; Frances Graham; and Robert H. Gibbs as Class and Subclass Representatives.

Carl Liggio, John Matson, New York City, for Arthur Young & Co., Harry C. Erwin, Billy Joe Cabaniss, Jr., Joseph F. Drozal, Jr. and Charles M. Hanson.

James M. Roy, Jr., Roy & Lambert, Springdale, Ark., Michael H. Mashburn, Fayetteville, Ark., for Arthur Young & Co.

Fred H. Harrison, University of Arkansas, Little Rock, Ark., for W.J. Rimmer.

Fines F. Batchelor, Jr., Van Buren, Ark., for Truman O. Boatright, Hugh Winfrey, Jr., Jimmy Don Gooch, Ralph McClure, Joe Wayne Harris, James Willis, Dan Ray Core, Harold Davis and Jay Freeman.

Carl Creekmore, Morril H. Harriman, Jr., Van Buren, Ark., for Carl Creekmore and Morril H. Harriman, Jr., Ind. and d/b/a Creekmore & Harriman, a partnership.

Jerry Lee Canfield, Daily, West, Core, Coffman & Canfield, Fort Smith, Ark., for Citizens Bank & Trust Co.

Robert L. Jones, III, Jones, Gilbreath, Jackson & Moll, Fort Smith, Ark., for Gene Kuykendall and Fred Kuykendall, Ind. and d/b/a Kuykendall & Kuykendall, a partnership.

Thomas B. Pryor, Pryor, Robinson and Barry, Fort Smith, Ark., for Oran Moody, Jr. and Michael O. Moody, Ind. and d/b/a Moody and Moody, a partnership.

Eddie N. Christian, Christian & Beland, Fort Smith, Ark., for Jack E. White, J.E.W., Inc. and Valley Feeds, Inc.

Jim Jones, Sallisaw, Okl., for M.V. Creech, Charles Bane and Jerry Metzger.

Jerry D. Pruitt, Pruitt & Hodnett, Fort Smith, Ark., for Hal Brewer, Don Sebo and E.H. Pritchett, Jr.

Kenneth R. Mourton, Ball, Mourton and Adams, Fayetteville, Ark., for Ball, Mourton & Adams, A Partnership.

Mark A. Grober, Sandlin, Payne & Grober, Muskogee, Okl., for Robert Plunkett.

S. Walton Maurras, Harper, Young, Smith & Maurras, Fort Smith, Ark., for George Wagnon, Raymond (Jack) Clark, Eddie Joe Smith, Waldo Price and J.O. McClure.

Ronald D. Harrison, Harrison and Hewett, Fort Smith, Ark., for Kirit Goradia.

James B. Blair, Springdale, Ark., for E.J. Ball, Kenneth R. Mourton and Stephen E. Adams, Ind. and d/b/a Ball, Mourton & Adams.

James A. Arnold, II, Shaw, Ledbetter, Hornberger, Cogbill & Arnold, Fort Smith, Ark., for Jay Neal, Jr.

Gary D. Corum, Wilson, Engstrom, Corum & Dudley, Little Rock, Ark., for Harry Erwin.

E.E. Maglothin, Jr., Putman & Maglothin, Fayetteville, Ark., for Ball, Mourton & Adams.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

The plaintiff class, holders of demand notes issued by the Farmers Co-op of Arkansas and Oklahoma, Inc., has moved for summary judgment on its state securities law claims against certain Co-op directors and employees. The class alleges that the Co-op demand note program constituted a sale of "securities" as that term is defined in the Arkansas Securities Act. Ark.Stat. Ann. §§ 67–1235 et seq. (1980 Repl.). The class maintains that inasmuch as these demand notes were neither registered during the period April 8, 1980, to October 28, 1983, nor validly exempt from registration, the sales were unlawful. They filed this motion to rescind the purchases of unregistered demand notes, and to recover the consideration paid plus six percent (6%) in-

terest as provided by law. Ark.Stat.Ann. § 67–1256(a)(2) (1980 Repl.).

The district court referred this question to the magistrate pursuant to a pre-trial referral order previously entered in June, 1985. On March 27, 1986, the magistrate issued his proposed findings and recommendations. He found that the demand notes were securities under the Arkansas Securities Law, and that Jack White, the Co-op's general manager during part of the period, performed the functions of a corporate president, and was therefore liable under Ark.Stat.Ann. § 67–1256(b). The magistrate believed that Kirit Goradia, the Co-op office manager, raised a material issue of fact as to whether he performed the duties of a corporate officer, or "materially aided" the sale of the notes. He therefore denied summary judgment against Goradia.

With respect to the Co-op's directors, the magistrate found that they were persons explicitly made liable under the statute, without regard to whether they aided a sale or performed executive duties. Ark. Stat.Ann. § 67–1256(b). He found, however, that the directors' affidavits made out a submissible case that they did not know, and in the exercise of reasonable care could not have known of the existence of facts by virtue of which the liability is said to exist.

All parties filed timely objections to the magistrate's proposed findings and recommendations. In addition, the court has reviewed an *amicus* filing from Arthur Young & Co., which wished to advise the court of its position that the Co-op demand notes are not "securities." Arthur Young believes that a ruling unfavorable to the defendants may foreclose argument on a cognate issue under the federal acts. The court does not believe that its resolution of state law questions necessarily settles the federal securities issue. The court has devoted considerable attention to the legislative history of the Arkansas Securities Act of 1959. This history, in several particulars, is distinct from that of the Securities Act of 1933, and of the Securities Exchange Act of 1934. Whether those differ-

ences are so critical as to mandate a different result, the court reserves for further argument on another day, although federal precedents will necessarily be discussed in this opinion.

## A. Are Demand Notes "Securities" Under Arkansas Law

The parties have closely argued the question whether the Co-op's demand notes are "securities" subject to regulation by the Arkansas Securities Act. Ark.Stats.Ann. §§ 67–1235 *et seq.* The Act provides:

> 67–1247. *Definitions of Terms Used.* When used in this act, unless the context otherwise requires: ...
>
> (1) "Security" means any *note;* stock; treasury stock; bond; debenture; *evidence of indebtedness;* ... or in general any interest or instrument commonly known as a "security".... (emphasis added).

The magistrate found that the instruments issued by the Co-op were "notes" or "evidences of indebtedness" included within the definition of "security" set forth in the statute. The Eighth Circuit, however, has held that not every note is a security for purposes of either the Arkansas or the federal securities acts. *See Union National Bank v. Farmers Bank*, 786 F.2d 881 (8th Cir.1986).

The United States Supreme Court, in *dicta,* has also questioned whether all notes should be treated as securities under federal law. *Landreth Timber Co. v. Landreth,* —— U.S. ——, 105 S.Ct. 2297, 2306, 85 L.Ed.2d 692 (1985). While we are only concerned with the Arkansas Securities Act, we must acknowledge that Arkansas's definition of "security" is borrowed from that of the Securities Act of 1933, 15 U.S.C. § 77b. Distinctive features of the Arkansas Act impel us to the conclusion that demand notes issued by a farmers' cooperative are securities, and that these particular features, combined with state and federal court interpretations of relevant sections of the Act, allow our conclusion to stand alone.

Nevertheless, *Kansas State Bank v. Citizens Bank,* 737 F.2d 1490, 1495–96 (8th Cir.1984), urges that even in state Blue Sky Law cases, some attention be paid to federal precedents, and we shall do so. We believe, however, that our analysis of the Arkansas act permits us to conclude, as a matter of summary judgment, that the demand notes are securities. We hope that our opinion offers "a carefully reasoned ruling on a question of state law" sufficient to satisfy the *Kansas State Bank* court's concern on this point. *Id.* at 1496.

Our opinion will therefore proceed to analyze the question on the basis of the Arkansas Securities Act, its history, development, and interpretation in both the state and federal courts. Secondary sources will include not only a learned commentary on the state court's interpretations of the securities laws, but also an article specifically cited by the state court as an authoritative guide for the resolution of this question.

Federal precedents, too, will be examined to determine whether these notes are disqualified from being treated as securities under the federal statutes. Federal courts have found certain kinds of notes to be securities, and contrarily. We believe that salient features of the notes offered by the Farmer's Co-op of Arkansas and Oklahoma, Inc., direct a conclusion that a broad scale offering of unsecured debt instruments to a passive public constitutes an investment transaction, rather than a commercial loan.

Turning now to our analysis of the state law, we believe that the Arkansas General Assembly intended note programs such as the Co-op's to be subject to review by the securities commission. The first word of the definition of security is "note." Presumptively, notes issued by a corporation to generate capital are securities. Granted, under the plain language of the statute, an isolated personal loan of $100.00, evidenced by an I.O.U., can be deemed a security. Such a transaction would qualify for an exemption, Ark.Stat.Ann. § 67–1248(b)(9); that, however, does not answer the point. Such a borrower would have to qualify it through the securities commission, and would incur administrative expenses far in excess of the "proceeds" of the "issue."

On the other hand, it is equally absurd to suppose that a "note" or "evidence of indebtedness" can never be a security subject to state regulation. Such an interpretation would require the court to hold that the words are inappropriately included in the statute. Defendants, in fact, urge this court to hold that no instrument can ever be deemed a security unless it possesses *"all* of the characteristics typically associated with a security," *Gould v. Ruefenacht,* —— U.S. ——, 105 S.Ct. 2308, 2311, 85 L.Ed.2d 78 (1985), including, presumably, equity in the enterprise. Such a view encourages Ponzi schemes.[1] One can easily imagine how promoters of scantily capitalized corporations might secure investment by promising high rates of interest, exceeding those available under long-term CDs, but unencumbered by substantial penalties for early withdrawal. Initial investors could be paid from funds of subsequent depositors. Their "success" would encourage still more gullible souls to invest their savings in the enterprise. Unfettered by regulation of any kind, the promoters could trumpet that such notes are "just like a bank account," instantly liquid, but far more profitable, paying interest thrice the passbook rate. Unsophisticated investors could be conned away from the regulated and insured world of banking by dark remarks hinting that the banks cheat their depositors. After all, "everyone knows" that capital appreciates at an annual rate of 20 per cent or so, and that "eastern bankers" grow rich by paying only 5 or 6 per cent to the plain people of Arkansas.

Scams such as these have invariably collapsed under their own weight. State law

---

1. Charles Ponzi was a Boston "financier" who dazzled sophisticated East Coast investors. His concern, ironically named the Securities Exchange Co., promised 50% interest on 45-day notes. When he was thrown into bankruptcy in August, 1920, six Boston banks closed. "Ponzi schemes" often feature notes whose repayment is "guaranteed." They are pyramid schemes.

security regulation predates federal enactments, and are familiarly known as Blue Sky Laws. They are designed to combat airy investment schemes, and to protect a gullible public. The vehicle by which this is done is the imposition of personal liability on every person who controls a seller, every partner, officer, director, or person occupying a similar status, and every employee who materially aids the sale of a security. Ark.Stat.Ann. § 67–1256(b).

■ The penalties for sale of securities without registration or exemption are slight. They allow the purchaser to rescind the transaction and collect a minimal 6 per cent interest. Ark.Stat.Ann. § 67–1256(e). The statute is remedial, not punitive, and is to be liberally construed in favor of investors. Those persons made liable under the statute are those who stand to profit from the solicitations, or those who enable the project to succeed. It requires such persons to report accurately the financial status of their company, to submit to oversight, and to inform the public of the risks of the enterprise. (In the case of actual fraud, more onerous damages may be recovered, but this is no more than is allowed at common law.)

The extent of the liability for trespassing the law is peculiarly within the defendants' power to limit. All men are charged with knowledge of the law. That a given offering involves a securities question is more or less apparent, perhaps less so in the case of a note than in the case of sales of stock. But in the twilight of the twentieth century it should hardly come as a surprise that government pervasively regulates the broad-scale solicitation of capital for investment. In this case over $10,000,000 was raised from more than 1600 persons. No one supposes that such a level of financing could ever be obtained from a bank or from an individual without the most thorough screening and the soundest collateral. To suppose that a state would trouble itself to define a security as a "note" and then permit broad-scale solicitation of its citizens, inviting them to loan vast amounts of money without security, is essentially to suggest that no note can ever be a security no matter what the statute says.

We are, in fact, absolutely convinced otherwise. The legislative history, sources, and subsequent interpretation of the Arkansas Securities Law fully convince us that the Co-op's program is a classic securities transaction, which requires registration or exemption.

In 1959, the Arkansas General Assembly enacted its variant of the Uniform Securities Act. The Hon. Charles Stewart, attorney and legislator, reported on this development in Note, *Arkansas Securities Act of 1959*, 13 Ark.L.Rev. 323, 324 (1960), saying:

By 1958, the Uniform Securities Act had been adopted in something like complete form by Hawaii, Kansas and Virginia. The Virginia statute was modeled on an earlier draft of the Act. Arkansas Act 254 of 1959 was introduced into the Senate incorporating verbatim the entire Uniform Securities Act as approved by conference in 1956. Before final passage by the legislature, a considerable number of amendments had been attached to the Senate Bill, making in most cases minor changes with regard to the Uniform Act; however, because of its differences, the title of the act was changed to the Arkansas Securities Act.

In the Uniform Securities Act, § 402(a)(12), the commissioners advised state legislators to "insert any desired exemption for co-operatives." The commissioners explained their hesitance to prescribe a specific formula for regulating, or exempting securities issued by cooperatives as follows:

At least eighteen states (Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Massachusetts, Minnesota, Missouri, Montana, North Dakota, Ohio, Oregon, South Dakota, Texas, Vermont, Virginia and Wisconsin) contain exemptions for securities issued by co-operatives, but their provisions vary so sharply that no common pattern can be found. This presumably reflects varying attitudes towards cooperatives quite apart from the blue sky

laws. For these reasons it was not practicable to draft a specific exemption for co-operatives. If one is desired, it should be inserted here."

The Arkansas Securities Act of 1959 contained no exemption for cooperatives. In 1975, the General Assembly by Act 844, § 8, offered an exemption to agricultural cooperatives by amending the original act to read

Section 8. Subsection (a) of Section 14 of Act 254 of 1959, as amended, ... is hereby amended to add subsection (12) to read as follows:

(a) * * *

(12) any security, other than preferred stock sold or offered for sale to non-members, issued by any agricultural cooperative associations organized other than under the laws of this state.

This cooperative exemption was amended by Act 493 of 1977 in the next legislative session to read:

Section 7. Paragraph 12 of subsection (a) of Section 14 of Act 254 of 1959, as amended, ... is hereby amended to read as follows:

(12) Only equal voting common stock or equal voting membership securities issued solely to members by a cooperative association organized and operated as a non-profit corporation under Act 116 of 1921.... No commissions or other remuneration may be paid in connection with the offer or sale of such securities.

In the next legislative session, by Act 754 of 1979, the present law was enacted, which has escaped revision. This statute exempts securities issued by farm cooperatives as follows:

(12) The following shall apply to farm cooperatives organized and operated in this State ... and to any nonprofit farm cooperative which is qualified to do business in this State:

(1) Any common stock, preferred stock, *promissory note* or debenture may be issued to any cooperative member after compliance with subsection (c).... (emphasis added).

This exemption is not absolute, but qualified, and only given after the cooperative has applied for and proven its qualifications for the exemption. Such a procedure is also required for so-called "non-public offerings." *See* Ark.Stat.Ann. § 67–1248(b)(9).

The legislative history demonstrates that the General Assembly gave a great deal of attention to the special problems of securities issued by cooperative associations, and farm cooperatives specifically. The state securities department was certainly aware of the means by which farmers' co-ops obtained their financing, and of demand note programs like the one involved in this litigation. Defendants' affidavits reflect that the securities department began investigating the Co-op's program in 1975 or 1976 (*i.e.*, Brewer's affidavit, p. 3), and that the department informed the Co-op of the 1977 amendment. *Id.* The 1979 amendment specified that co-op *promissory notes* could be exempted *securities,* provided that the issuer file for an exemption. Without an exemption, the securities had to be registered. The 1979 amendment identified the very instrument before us—a promissory note issued by a farmers' cooperative—and designated it as a "security" subject to exemption or registration. *Amicus* counsel for Arthur Young suggests that the demand nature of the Co-op's notes is not characteristic of a security. It is, however, a feature of a promissory note that the law implies that payment is due on demand if time is not otherwise specified in the instrument. *Huyck v. Meador,* 24 Ark. 191 (1866). *Cf.* U.C.C. § 3–104(c). That the legislature specifically recognized cooperative-issued promissory notes as securities eligible for exemption is convincing evidence, we believe, that such instruments were meant to be regulated.

Furthermore, the Arkansas Securities Act of 1959 replaced the Securities law of 1947. The 1947 Securities Act exempted all "unsecured commercial paper." Act 1947, No. 397 § 5(c). This exemption was not carried forward into the 1959 Act except for so-called "prime" commercial pa-

per. Ark.Stat.Ann. § 67–1248(a)(9). This convinces us that the legislature, far from narrowing the definition of "security" to exclude most notes, has broadened the definition so as presumptively to include most debt instruments as securities, save in those contexts where it would be inappropriate.

While the Arkansas Supreme Court has not addressed the specific question raised in this case, its decisions in other cases provide sure and steady guides. In Note, *A Definition of "Investment Contracts" and Equitable Defenses to Suit for Rescission for Nonregistration Under the Arkansas Securities Act*, 1 U.A.L.R. L.J. 366 (1978), the writer suggests that Arkansas's concept of what constitutes a security is flexible, following the approach first suggested by the Minnesota Supreme Court in *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 177 N.W. 937 (1920). The Arkansas Supreme Court chose this approach so that the statute might "encompass the endless succession of new and innovative or old and tired promotional schemes, where the promoters, by design seek to risk the money or property of others in their venture." *Schultz v. Rector-Phillips-Morse, Inc.*, 261 Ark. 769, 777, 552 S.W.2d 4, 8 (1977).

A flexible approach is less desirable in the context of a criminal prosecution than in a civil case. Accordingly, the court next held in *Smith v. State*, 266 Ark. 861, 587 S.W.2d 50 (1979), that five elements determine whether a given transaction involves the sale of a "security." The elements are: (a) the investment of money or money's worth; (b) in a venture; (c) the expectation of some benefit to the investor as a result of the investment; (d) the contribution towards the risk capital of the venture; and (e) the absence of direct control over the investment or policy. This test was de-vised by a scholar, who published it in a law review article cited by the court as the source for its holding: Long, *An Attempt to Return Investment Contracts to the Mainstream of Regulation*, 24 Okla.L.Rev. 135 (1971).

Under the *Smith* test, these demand notes are securities. Obviously, money was invested in the Co-op with the expectation that the investor would receive a benefit from his entrustment. This is not seriously disputed by the defendants. In fact, it is not disputed at all. Defendants maintain that a stated rate of interest cannot be a "profit," and borrow *dicta* from federal cases to substantiate their point. But surely the state intends to protect its citizens from schemes whereby institutions promise extravagant interest on savings-like accounts whose instant liquidity attracts the savings of its workers. As the law review article credited to be the source of the *Smith* test explained:

> The third significant common characteristic of traditional securities is the expectation of some kind of benefit from the investment. In the case of bonds, notes, or debentures, it is the interest paid."

24 Okla.L.Rev., at 144.

Again, if "interest" is not a "profit" within the meaning of securities, then no note, bond, or debenture can ever be regulated by such statutes. This would mean that the greater part of all investment capital would be exempt from any kind of regulation because promoters would label the benefits from their activities as "interest." It would be odd indeed that a promoter would be liable for making "double your money" pie-in-the-sky promises of "profits" and "dividends," but could entirely escape accountability for equally outrageous claims that savers can earn 100% "interest" on their "accounts."[2] Each

---

**2.** If it be objected that the court is indulging in *reductio ad absurdum* argument, and that no one has ever offered such rates for "notes," it bears reminding that on August 9, 1920, when federal authorities closed the Ponzi operation for mail fraud, a rival concern called the Old Colony Foreign Exchange Co. promised dis-appointed Ponzi investors 100% interest on six month notes. *N.Y. Times*, Aug. 10, 1920, at 8. Two days previously, the Massachusetts Attorney General lamented that the Commonwealth had no state law authorizing him to suspend or control Ponzi's affairs. *N.Y. Times*, Aug. 8, 1920, at 23. Massachusetts passed its Blue Sky

promise is illusory; each scheme is identical save for labels; each solicitation is equally fraught with peril for the unwary investor.

The *Smith* opinion, quoting the article by Long, requires that the money invested constitute "risk capital." Certain defendants have argued that the money was not put at risk in the classic sense since the benefit was *promised* regardless of the success of the venture. This is not the meaning intended by the *Smith* court.

As Professor Long says in his article: The fourth significant common characteristic is a little more subtle. In the case of all generally recognized types of securities, the investment by the investor becomes a part of the capital pool used to conduct the business. Further, whether the investor will receive the benefit which led him to invest initially depends upon the successful employment of this capital....

In the case of bonds or debentures, the capital furnished becomes part of the assets of the venture and the investor is promised two benefits: (1) a certain amount of interest on his money and (2) the eventual return of his investment. Whether these two benefits will in fact occur depends on the successful nature of the business, and the investor rather than the promoter bears all the risk that it may not occur.

It is important to note here that it has not yet been required that the investor acquire an equity interest in the enterprise or that one of the benefits offered must be a return of the investment. Clearly in the case of bonds, debentures, or notes no equity interest is given. Instead a debtor-creditor relationship is created. Therefore when we refer to the investment as being a capital contribution, we are using the word "capital" in the broad economic sense rather than the

narrow legal meaning of an equity interest in a particular venture.
*Ibid.* at 167.

A study of Professor Long's article fully persuades us that the Co-op note program lies in the very heartland of transactions intended to be regulated by state legislation. Regardless whether a court adopts a flexible approach, as in *Rector-Phillips-Morse*, or a more restrictive criminal enforcement-oriented one as in *Smith*, the Co-op's demand notes are securities.

It is instructive that in *dicta*, in a case arising out of our district, in the infamous Arkansas Loan & Thrift scandal, the court indicated that savings accounts were securities for purposes of the federal statute, which the parties suggest is more restrictive than the state law. There the court recited that:

The record before Judge Miller disclosed that after July, 1965, the defendant AL & T had issued more than four million dollars worth of interest-bearing bond investment certificates, many of them to innocent members of the public who apparently thought they were investing in savings accounts similar to those provided by banks and savings and loan associations.

*Securities and Exchange Commission v. Bartlett*, 422 F.2d 475, 478 (8th Cir.1970). The trial court in the same case referred to these "accounts" as securities, saying "The persons whose interest the court has been asked to protect are holders of debt securities issued by the corporations in receivership. The record establishes beyond any doubt that the securities were sold through fraud...." *Securities and Exchange Commission v. Arkansas Loan & Thrift*, 294 F.Supp. 1233, 1244 (W.D.Ark.1969). This latter observation is in response to the suggestion of *amicus* counsel that demand notes could not be securities since depositions have revealed that the plaintiffs in this case used the notes like bank accounts, adding or withdrawing money whenever

law shortly after, on May 27, 1921. Acts 1921, chap. 499. Its definition of security included

any "note."

they wished. This may be true. That is often true of Ponzi schemes. Certainly, the Co-op advertised the fact that this investment had features much like a bank or savings account.

In summary, the court believes that the demand notes issued by the Farmer's Co-op of Arkansas and Oklahoma, Inc., are "securities" for purposes of the Arkansas Securities Act. The court believes that two considerations unique to Arkansas fully support its conclusion: first is the legislative history of the act. Before the 1959 Act, all unsecured notes were automatically exempted. After 1959, only "prime" commercial paper enjoyed exemption from the act. For a time, investment programs run by cooperatives enjoyed no exemption. Then, in 1975, the General Assembly flatly exempted all securities other than preferred stock sold to non-members. Evidently, such a broad exemption was unsatisfactory, and in 1977, the General Assembly offered cooperatives a limited exemption for equal voting common stock and membership securities. This amendment imposed a duty to register the demand notes. Finally, in 1979, the legislature offered an exemption to cooperatives for stock and notes issued to members, provided that the cooperative procure an exemption for the issue similar to that required for "non-public offerings." Ark.Stat.Ann. § 67–1248(e).

The second consideration, unique to Arkansas, which supports our conclusion is that the Arkansas Supreme Court has chosen to follow the "Minnesota Rule," a broad protectionist approach to regulation. In the context of criminal enforcement, where one might expect the statute to be "strictly construed," the court adopted a five-part test formulated by Professor Long, whose explanation of what he meant by "risk capital" and "profit" reinforces our conclusion that notes such as those issued by the Co-op are securities subject to regulatory control, even under the "strictest construction" of the statute.

To the extent that the Arkansas Securities Act borrowed the definition of "security" from the federal Securities Act of 1933 and the Securities Exchange Act of 1934; and to the extent, therefore, that those seeking relief under the state law are by that token bound to honor federal interpretations of that definition, we are moved to opine that those federal cases holding that certain kinds of "notes" are not "securities" do not succor the defendants in this case. No federal court has ever suggested that a broadscale public offering of notes is a transaction outside the scope of the federal securities acts.

Federal courts are zealous to assure that the Securities Acts of 1933 and 1934 not be construed to admit to federal jurisdiction every kind of commercial transaction gone sour. Because notes are included within the definition of security, the mischievous possibility exists that every time a person or a bank extends a loan to another, and receives his note in return, a federal case is made out if the obligor has failed to register his "offering" or has inflated his net worth on a financial statement. No one seriously contends that the historic 73rd Congress intended so to trivialize the regulation of securities transactions. Because the statute admits of such a construction, and because it imposes personal liability in cases where parties have lent solely on a corporation's credit, lenders obviously have great incentive to try and exploit the statutes to recover on their loans. To the extent that federal courts allow this to happen, they "open the floodgates," as it were, to bankers embarrassed by defaults. Besides burdening the federal courts with matters not properly of concern to them, such a course of action encourages—or at least fails to discourage—imprudent banking practices. Consequently, the federal courts have been loathe to include common commercial transactions within the reach of the securities laws, and have devised tests which exclude from their ambit those isolated transactions by which a bank or finance company lends money on the security of a debtor, and cannot recover from him when the loan falls due.

One test devised by the federal courts is a so-called "context" test. The federal statutes, like the Arkansas act, hold that defined terms shall have the meaning ascribed to them in the statutes "unless the context otherwise requires." *See, e.g.,* 15 U.S.C. § 77b; 15 U.S.C. § 78c; Ark.Stats. Ann. § 67–1247.

In *Lino v. City Investing Co.,* 487 F.2d 689 (3rd Cir.1973), the court decided that personal promissory notes issued by a private party in partial payment for a franchise did not involve a securities transaction. In its words:

All of the definitional sections involved in this case are introduced by the phrase "unless the context otherwise requires." The commercial context of this case requires a holding that the transaction did not involve a "purchase" of securities. These were personal promissory notes, and the issuer was the person claiming to be defrauded. The notes were not procured for speculation or investment, and there was no indication that [defendant's subsidiary] was soliciting venture capital from Lino.

In no way could City Investing be said to have "purchased" Lino's notes for speculation or investment. City Investing was selling a certain contract right to Lino, not buying his security....

To accept Lino's argument would mean that any consumer who bought an article "on time" and issued a note would be able to sue in a federal court on the theory that the retailer had purchased his security.

The "context" approach presumes that a note is a security, subject to its being excluded from the coverage of the act where a party can show that the underlying transaction was not of the type governed by the securities laws. Courts using the context approach are not spacious in their explanations of how one determines whether the "context otherwise requires." The general trend, discerned in cases such as *Zabriskie v. Lewis,* 507 F.2d 546 (10th Cir.1974); *Bellah v. First National Bank,* 495 F.2d 1109 (5th Cir.1974); *S.E.C. v. Continental Com-*

*modities Corp.,* 497 F.2d 516 (5th Cir. 1974); and *McClure v. First National Bank,* 352 F.Supp. 454 (N.D.Tex.1973), is to exclude those notes more nearly "commercial" in character, while treating as securities those notes deemed "investments." This approach receives inferential support from *dicta* in *Landreth Timber Co. v. Landreth,* —— U.S. ——, 105 S.Ct. 2297, 2306, 85 L.Ed.2d 692 (1985), which said:

As we recently suggested ... "note" may now be viewed as a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context...."

The *Landreth Timber Co.* dissent expresses similar sentiments, saying:

I believe that Congress wanted to protect investors who do not have access to inside information and who are not in a position to protect themselves from fraud by obtaining appropriate contractual warranties.

At some level of analysis, the policy of Congress must provide the basis for placing limits on the coverage of the Securities Acts. The economic realities of a transaction may determine whether "unusual instruments" fall within the scope of the Act ..., and whether an ordinary commercial "note" is covered.... The negotiation of an individual mortgage note, for example, surely would not be covered by the Act, although a note is literally a "security" under the definition. *Cf. Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 937 (2d Cir.), *cert. denied,* [—— U.S. ——,], 105 S.Ct. 253 [83 L.Ed.2d 190] (1984). The marketing to the public of a large portfolio of mortgage loans, however, might well be.

*Landreth Timber Co., supra,* 105 S.Ct. at 2312.

If our task is to determine whether the Co-op's notes were issued in the context of an investment transaction rather than a commercial one, we must recognize that there are no precise tests for making the distinction. We are helped by the fact that

in this case the issuer, the Farmer's Co-op, labeled its notes as an "investment." Its monthly newsletters [Plaintiffs' Exhibits, Tab B, Exhibit 2] prominently headlined information about the demand note offering as "Coop Investment Program." In the body of the advertisement the Co-op advertised that the Co-op had more than "$11,000,000 in assets to stand behind your investments. The investment is not Federal Insured but it is ... safe ... secure ... and available when you need it." The directors have alleged that they had nothing to do with the wording of the advertisement; that does not answer the point that under the laws they are answerable for it. If this were a fraud case, based on misstatements in the newsletter (and in another count not subject to this motion, plaintiffs invoke such a theory), the directors would be presumptively responsible for the wording of the circular, unless they could bear the burden of proving that they justifiably did not know of the existence of the advertising, or that in the exercise of due care they could not have known that it contained factual misstatements. The court does not conceive that the directors claim not to have *known* that the program for which they are responsible was termed an investment program, even if they personally were not the parties who wrote the newsletter.

In the event that it is insufficient that the Co-op advertised its program as an investment opportunity, and that the directors acquiesced in that characterization, the way that the Co-op conducted its affairs points even more strongly to the conclusion that the notes were investment instruments, rather than commercial transactions. First, the instruments here in question were issued to a large number of parties. *McClure v. First National Bank of Lubbock*, 497 F.2d 490, 493 (5th Cir.1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1973). In the ordinary commercial loan transaction, an applicant approaches one or a small number of lenders and seeks a given amount of capital, frequently collateralizing his request with a greater amount of assets or guaranties.

In this case, the Co-op approached its 23,-000 members, and non-members as well, with a proposal that they transfer an indeterminate amount of capital to the enterprise, without collateral or insurance of any kind. More than 1600 members did, allegedly to the tune of more than $10,000,000, and that is why we have a securities question. Even in the absence of precise rules for distinguishing commercial transactions from investments, common sense tells one that this program is not a commercial loan.

In *C.N.S. Enterprises, Inc. v. G & G Enterprises, Inc.*, 508 F.2d 1354, 1361 (7th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975), the court thought it important to consider the relationship between the dollar amount borrowed: the larger the amount relative to the size of the borrower's business, the greater the risk to the lender. The amount of money involved in this issue was quite large, and the extent of the risk has sadly been realized. In this connection, the absence of collateralization is relevant to a risk analysis since the unsecured lender is much more dependent for repayment on the skills of the borrower than is a secured party.

*Amicus* counsel have asserted that because the instruments in question are demand notes, they are *ipso facto* not securities, *citing Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1257 (9th Cir.1976). That is a partial abstract of the court's statement, which went on to suggest that demand notes could be considered securities if "payment is dependent on the success of a risky enterprise." *Id.* Furthermore, the *Great Western* court said that no single factor determines the question. *Id.* at 1258. The problem with a mechanical test such as the amicus party would have us apply is that it elevates form over substance; furthermore, it allows the issuer, in this case the Co-op, to choose a form—*i.e.*, demand notes—which evades regulation, while allowing it to substantially practice the very evil which blue sky laws were designed to deter: the broadscale, public solicitation of large amounts of unsecured capital for deployment in a speculative ven-

ture. This is all the more dicey an undertaking because of the demand feature of the notes. Because such instruments are susceptible to "runs," the venture which they finance is always at the risk of either rumors of ill fortune attending its own operations, or, conversely, general business reverses in the community of its investors necessitating their withdrawal of capital from the enterprise. Furthermore, the Co-op notes [Plaintiffs' Exhibits, Tab B, Ex. 1] contain no restriction as to the use to which the funds may be put. This further puts the "investor" at risk. To the extent that the issuer is able to put demand note funds into long-term projects as opposed to current operations or inventory, its ability to absorb a run is seriously imperiled. These circumstances impel a conclusion that the Co-op's demand notes are securities, notwithstanding the contention that under other circumstances such an instrument might not be considered an investment.

It bears remarking that cases holding that particular notes were not securities fail to bear any resemblance to the facts of this case. They constituted either loan participations involving banks, or isolated commercial loans involving a limited number of parties with no public offering. For every case holding that notes are not securities, one can find three saying that they are. *See generally* Lipton & Katz, *"Notes" Are Not Always Securities*, 30 Bus.Lawyer 763, 770–71 (1975). *See also Promissory Notes as Securities*, 39 A.L.R.Fed. 357 (1978). In addition, as we have mentioned, *dicta* in the district and appeals court decisions in the infamous Arkansas Loan & Thrift scandal of the late 1960's, indicate that an investment scheme almost identical to the one at bar was deemed to involve the issue of securities under federal laws. There appears to be little argument that federal securities law precedents involving promissory notes bar their being considered as securities under the Arkansas statute.

To the extent that such an argument exists, it is based on *Securities and Exchange Com. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

*Howey* used a four point test to determine whether a given "investment contract" is a security for purposes of federal enforcement. "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. *If that test is satisfied, it is immaterial whether the enterprise is speculative or nonspeculative....*" *Id.* at 301, 66 S.Ct. at 1104 (emphasis added).

The Co-op itself labeled the transaction an investment. Putting aside any question whether the directors should be bound by that characterization of the program, it bears a stunning resemblance to an investment scheme, certainly far more so than it does to a commercial loan. It cannot be gainsaid that the investment was directed toward a common enterprise. This leaves only the question whether the noteholders expected to receive profits from the efforts of others.

In clearly commercial "contexts," the courts have held that interest does not constitute a profit. *Kansas State Bank v. Citizens Bank*, 737 F.2d 1490, 1495 (8th Cir.1984). It is broadly contended that anytime the investors "return remains fixed," there can be no profit. That is why it is important to note that *Howey* declares that it is immaterial that a venture is supposedly "non-speculative" in nature. An instrument is a security under the *Howey* test if the return, fixed or variable, depends on the managerial efforts of others. To hold otherwise would be to hold that four essential terms of the statutory definition of security—"note," "bond," "debenture" and "evidence of indebtedness"—are to be judicially written out of the coverage of the laws. This would mean that the very kind of instrument used by Mr. Ponzi to such great effect, a short term, uncollateralized note, could entirely escape regulation. It would be irony indeed that Ponzi, whose machinations contributed so greatly to the development of securities laws in this country, should find his note-based scheme practically the only one not controlled by the laws he made so needful in

the first place. Reading the arguments of the defendants, he might be encouraged to set up shop in the old stand again, no doubt relishing that his Securities Exchange Company, by a quirk of law, escapes oversight by the Securities Exchange Commission.

This court is confident that no American lawmakers, state or federal, intended so unseemly a result. Given Arkansas's bitter experience with the Arkansas Loan & Thrift scandals, an "issue" which surfaced again in the most recent gubernatorial primary, it is inconceivable that the General Assembly would have intended not to regulate the very kind of scheme which had so embarrassed the government less than a generation ago. On the record presented, the Co-op's demand notes are securities, which, from April 5, 1980, until October 28, 1984, were neither registered nor exempt.

### B. The Knowledge Issue

All directors claim that they were ignorant of their liabilities under the state securities act, and are therefore excused. The best that can be said of this contention is that, in essence, the directors maintain that they did not know that they were breaking the law by conducting an unregistered demand note investment program; furthermore, that they relied on the advice and counsel of experienced bankers, lawyers and accountants who saw "nothing wrong" with the program. Finally, as far as the directors knew, the Arkansas Securities Department saw nothing wrong with the program, and if the department had alerted the directors that anything was wrong, the board would most certainly have ordered immediate compliance, since it was Co-op policy to remain within the law.

■ Arkansas Securities Act provides: § 67–1256 Civil liability.—(a) Any person who

(1) offers or sells a security in violation of Section 3, 7, or 17(b) ... or of any rule or order under Section 15 ... which requires the affirmative approval of sales literature before it is used, or of any condition imposed under Section 10(d), 11(g) or 11(h),

(2) ... is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six percent [6%] per year from the date of payment....

(b) Every person who controls a seller liable under subsection (a) ... every partner, officer, or director of such a seller ... are also liable jointly and severally with ... the seller ..., unless the non-seller ... *who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist.* (emphasis added).

The following observations are pertinent. Subsection (a)(1) provides that any person who offers or sells a security in violation of Section 7 of the Act (Ark.Stat.Ann. § 67–1241) is civilly liable to the purchaser. Section 7 provides: "It is unlawful for any person to offer or sell any security in this State unless (1) it is registered under this act ... or (2) the security or transaction is exempted under Section 14...."

Subsection (b) of the Civil Liability statute makes not only those who *sell* the securities liable, but also those persons who *control* the issuer, including officers and directors, or those "occupying a similar status." Such non-sellers can absolve themselves from personal liability to purchasers if they can prove that they were ignorant of the existence of facts by reason of which the liability is said to exist. This ignorance will be bliss only to the extent that the non-seller can prove that even by the exercise of reasonable care he would have remained ignorant of the true state of affairs. In the context of this lawsuit, the director must be able to prove either (a) that he did not know demand notes were being sold, or (b) that he believed that the notes were registered or exempt. Furthermore, he must show that his belief was reasonable—*i.e.*, not arrived at negligently.

Finally, the statute provides for contribution as in cases of contract. In Draft,

Uniform Securities Act, § 410(b), Official Comment, the Conference of Commissioners noted:

> The defense of lack of knowledge is modeled on § 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). The last sentence, with reference to contribution, is a safeguard to avoid the common law rule which prohibits contribution among joint tortfeasors.

We conceive that this provision for contribution is intended to negate a defense of reliance on the advice of others. Such a defense is rarely available in any case. Courts have uniformly held that one may not rebut a charge of negligence by alleging that one relied on the advice of counsel. 57 Am.Jur.2d *Negligence* § 15 at 354, *citing Doran v. Dazey*, 5 N.D. 167, 64 N.W. 1023 (1895). The registration requirement of the Act is basically a "strict liability" provision. In speaking of the federal securities law, Hawes and Sherrard, *Reliance on Advice of Counsel as a Defense in Corporate and Securities Cases*, 62 Va.L. Rev. 3, 87 (1976), said: "Substantively, Section 5 [of the 1933 Act] as supplemented by Section 12(1) is a strict liability provision so that reliance on advice of counsel is relevant, if at all, only to the issue of criminality."

In a civil proceeding, one need not show wilfulness, as one must in a criminal prosecution. The liability imposed upon directors is strict, subject only to their showing that they were either unaware that the corporation was engaged in a securities transaction or that the directors reasonably believed that the securities being sold were properly registered or exempt.

The directors submitted virtually identical eight and nine page affidavits presenting their "side" of the issue. Excising all allegations not concerned, one way or the other, with the knowledge defense however broadly construed, the court has learned:

 (1) That all the directors are farmers, with no training in corporation or securities matters;

 (2) That the Co-op's demand note program was set up with the assistance of a Mr. Shelton, reputed to be a knowledgeable banker;

 (3) The directors hired qualified advisers—attorneys, accountants and management;

 (4) That at any time a question arose about the demand note program, the directors insisted that it be resolved with dispatch, and the directors were always assured that this was so;

 (5) The state securities department never alerted individual directors that there were any improprieties in the program. In 1976 the state securities department questioned the program and the directors then ordered the matter to be resolved. The state department never subsequently contacted them. In 1979, a question arose and the directors ordered the matter resolved. Thereafter, the state department never contacted any of the directors;

 (6) Again, in 1983, the state securities department raised a question about the program. The directors ordered Co-op employees to comply with the demands. The state securities department never contacted the directors about non-compliance;

 (7) The directors attended all meetings and obtained all possible information and used their best judgment;

 (8) The directors got most of their information from top management; however, directors also were available to hear lower-level employees out. The directors actively questioned their professional advisers;

 (9) The directors were unaware of any failure to file any documents required by the state securities department, and were never made aware of such a failure;

 (10) As far as the directors knew, based on information available to them by management, attorneys, account-

ants, and Co-op employees, there was no indication that any required filing had not been made;

(11) The state securities department praised the way the Co-op's attorney handled the securities registration in 1983;

(12) This communication from the securities department, and others, convinced the directors that everything was being lawfully done.

A review of these assertions places them in one of three categories: (1) that the directors did the best they could, but were unfamiliar with corporation and securities laws; (2) that the directors hired lawyers and accountants to help them, and the lawyers and accountants assured them that everything was all right, or at least failed to tell them of the legal hazards of the program; (3) that the state agency never contacted directors personally, or alerted them that they might be liable under the Act, because the Co-op had failed or was failing to do anything which the law requires. The affidavits admit that the directors were aware that the Co-op was offering its promissory notes to attract money. In fact, the affidavits all declare that "the purpose of the Demand Note program was to have funds available for payment of on-going Co-op obligations."

■ The directors were therefore actually aware of one fact upon which liability under the Act is based: that the Co-op was selling securities. They profess to have been ignorant of the legal implications that "demand notes" were "securities." Although there is evidence in their affidavits to suggest that this may not be so—*i.e.*, that they were thrice notified by the state securities department concerning the program (in 1976, 1979 and 1983)—this court is prepared to find for purposes of this motion that they were indeed ignorant of the legal characterization of the demand notes as securities. In the view of the court, that is irrelevant. Ignorance of the law, and of its characterization of a given transaction, is no excuse. The plaintiffs do not have to prove that the directors knowingly and wil-

fully trespassed the law, only that the Co-op sold unregistered securities. That alone makes a *prima facie* case against the directors. As long as the directors knew that the Co-op was selling demand notes, and they unanimously admit that they knew that, they cannot plead ignorance of the *facts* upon which liability is predicated.

Furthermore, the directors have admitted that they were at least aware that the state securities department regarded the notes as securities, and thrice contacted the Co-op board, presumably to caution the Co-op about "running without lights." Assuming, *arguendo*, that there was a genuine "knowledge" issue raised by the affidavits, can the directors even begin to raise a question that they were not negligent where (a) they were aware of securities problems, (b) simply relied on their advisers to clear up matters, and (c) did nothing personally to assure that the proper steps were taken.

■ The court believes that one cannot delegate responsibility to his lawyer when a securities violation is alleged. One doing so is liable and is left with an action for contribution against his counsellor.

■ Similarly, one may not shift blame to the securities department investigators and enforcers. The law imposes an absolute duty on directors to register securities prior to sale. This duty would be qualified if we were to hold that liability is tolled where an issuer can show that he didn't receive a specific warning from the state agency. The enforcement problems would be stupendous—a miniature version of what would result if the courts were to hold that one did not owe a tax on moneys "arguably" not includible as income until he had been personally warned by an IRS agent.

■ The second "fact" (itself mixed with law) upon which liability is predicated is that the securities sold were unregistered or non-exempt. Presumably, if a director can prove that he reasonably did not know that the securities were not registered, he might escape liability. That is a cumber-

some formula. It amounts to proving a negative. The better way of approaching this leg of our inquiry is as follows: what is the duty of a director who knows that his corporation is selling securities, or "demand notes"? That is very simple. His duty is to assure himself that the notes are indeed registered, and, if not, to stop the sales and to procure registration of the issue, or a valid exemption. Moreover, this duty is non-delegable. In Arkansas a director cannot delegate duties affirmatively charged to him. Directors are responsible to the corporation and its stockholders for the management of its affairs and they cannot shirk the duty by delegating it to others. *Wait v. McKee*, 95 Ark. 124, 129, 128 S.W. 1028 (1910). They are specifically charged by statute with the duty to register the issue or qualify it for exemption.

■ That is to say, ignorance of a duty to register securities, or to procure their exemption, can in no way excuse the failure to do so. The only conceivable excuse under the "lack of knowledge" defense would be if the director affirmatively believed that the securities were registered. In such a case, the director, believing the securities to be duly registered, would conclude that his duty had been discharged. Even then, the statute demands that such mistaken knowledge be not the product of negligence, and that the director bears the burden of proving that he was not so negligent.

If for example, the director had personally inquired of the securities department and learned that a registration statement was on file, this might excuse him from liability under the Act. *People v. Ferguson*, 134 Cal.App. 41, 53, 24 P.2d 965, 970 (1933), *But see, Subin v. Goldsmith*, 224 F.2d 753, 774 (2d Cir.1955), *cert. denied*, 350 U.S. 893, 76 S.Ct. 136, 100 L.Ed. 779 (1956); and *Petersen Engine Co., Inc.*, 2 S.E.C. 893, 902 (1937). The Arkansas Act

recognizes such a defense, in fact. Ark. Stat.Ann. § 67–1258(e) states:

No provision of this act imposing any liability applies to any act done or omitted in good faith in conformity with any rule, form or order of the Commissioner, notwithstanding that the rule, form, or order may later be amended or rescinded or be determined by judicial or other authority to be invalid for any reason.

Certain Blue Sky civil proceedings once refused to recognize the reliance defense. *Boss v. Silent Drama Syndicate*, 82 Cal. App. 109, 255 P. 225, 227 (1927). And there is some question whether reliance on a Commissioner's opinion (as opposed to order) is ever a valid defense. Comment, *Administrative Interpretation of the Securities Act of 1933*, 45 Yale L.J. 1076, 1078–79 (1936). Nevertheless, the fact that a director had inquired of the department and had been reliably informed that a registration was filed, coupled with other circumstances, might make out a case of excusable and non-negligent ignorance of the facts upon which liability is predicated.[3] In such a case, the director (who after all is not a seller—sellers cannot avail themselves of this defense regardless of their "lack of knowledge") could never do his duty because he would have no means of knowing that his duty called.

■ But in this case, the directors by their affidavits appear to rely on the securities department's silence. This can never, ever be an excuse. First, it shifts the burden onto the state; yet, the statute imposes the initial burden of notification on the issuer or seller—to notify the department and to submit proper filings. Administrative silence may estop the Commissioner from proceeding, but it cannot estop the purchaser.

Second, to the extent that the Arkansas Securities Act relieves one of liability because of administrative error, that error must be positive in nature—a positive rule,

---

**3.** *See,* however, *Graham v. Kane*, 264 Ark. 949, 576 S.W.2d 711 (1979), where a seller relied on a Security Department attorney's opinion that his partnership shares were not securities, only to be held responsible under the act for selling unregistered securities in a suit by a private party.

form, or order—not mere silence on the issue. To the extent that affiants seek to excuse themselves from liability because of what a state or federal securities examiner or commissioner *said* (and the statute appears to limit the kinds of communications upon which one may rely to a rule, form, or order), they have to allege that he *said something.* They cannot rely on a failure to regulate to excuse a failure to register.

Finally, of course, it is a familiar saw in the law that one cannot rely on silence as equaling assent. In view of the statute excusing reliance only in the case of a positive order, it would clearly be negligent for a director to rely on so insubstantial a ground as "silence" to conclude that he owed no further duty. That is, his ignorance is not excused. In analyzing the directors' submissions, individually and collectively, the court is convinced that they raise no issue of fact. The plaintiffs have made a *prima facie* case of sales of an unregistered security. The defendants have failed to offer even the slightest evidence that they were unaware of any fact on which liability is grounded. They admitted that they were all aware that the Co-op sold demand notes. None of them even suggested that they believed that the notes were registered. Instead, they said they "heard" that the securities department had raised a question, but since they were not later sued or notified personally that the problems persisted, they assumed that everything was all right. As Professors Hawes and Sherrard, in their article, *supra,* say, the securities acts are "strict liability" statutes, with a narrow exception available for nonsellers who control sellers. The directors' affidavits have raised no issue of fact cognizable under that exception.

### C. Officers' Liability

The Arkansas Securities Act imposes absolute liability on any party who sells an unregistered security. His lack of knowledge, no matter how justified, is no defense. Those who control the issuer, its directors, officers, and parties occupying the status of directors or officers, enjoy a slightly more relaxed standard of liability:

as we have seen, they may escape liability by proving a non-culpable ignorance of the facts. For this reason, the Arkansas Supreme Court has labeled the statute not a strict liability act, *per se,* but rather a "strict responsibility" law. *Graham v. Kane,* 264 Ark. 949, 953, 576 S.W.2d 711 (1979).

To this point we have found as a matter of law that the Co-op's demand notes are securities, and that as a matter of fact, the directors have failed to show that they were ignorant of any fact by which liability under the law is said to exist. Likewise, there is no issue of fact as to whether the directors serving on the Co-op Board between April 5, 1980, and October 28, 1983, "controlled" the corporation: the statute specifically recites that directors are so liable. Ark.Stat.Ann. § 67–1256(b) (1980 Repl.).

Jack White, the former general manager of the Co-op, and Kirit Goradia, its comptroller/office manager, are sued on the theories that they "materially aided the sale" of the demand notes, that they were "officers" of the Co-op (or occupied a similar status or performed a function similar to that of an officer), and that they controlled sellers of the notes. Unlike the directors, White and Goradia were fully knowledgeable not only of the existence of the demand note program, but also that the notes were securities, and that they were neither registered nor exempt. Indeed, the two corresponded with the Securities Department on several occasions about the program. That is, assuming that they are controlling parties, neither White nor Goradia can even *attempt* to avail themselves of the affirmative defense provided by the statute.

 Summary judgment was proper with respect to the directors since not one of them made out a case that he was ignorant of any critical facts. At most, the directors advanced the claim that they were personally unaware of the legal implications of the transactions they knew of and approved. The question is different *vis a' vis* White and Goradia. It is the

plaintiffs' burden to prove that these men were officers of the Co-op, or materially aided the sale of securities, and to prove that their claim is not open to the slightest doubt. *Traylor v. Black, Sivalls & Bryson, Inc.,* 189 F.2d 213 (8th Cir.1951). Summary judgment should be "cautiously invoked" so that no person will be improperly deprived of his Seventh Amendment right to a jury trial where there is no genuine issue as to any material fact. *Cf. Inland Oil & Transport Co. v. U.S.,* 600 F.2d 725 (8th Cir.1979), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1980).

The question becomes, then, whether White or Goradia are "officers" of the Co-op. Arkansas farmers' co-ops are organized under either Ark.Stats.Ann. §§ 64–1501 *et seq.,* 77–901 *et seq.,* or 77–1001 *et seq.* These statutes specify that the directors shall elect the officers. The officers are to be a president, one or more vice presidents, a secretary and a treasurer. It is clear from the records that neither White nor Goradia were ever elected to any such office by the board of directors.

■ Nevertheless, even though one does not hold the title of an officer, he may be liable if he performs functions similar to that of a corporate officer. What are those duties? Generally speaking, a corporate officer shall have such authority and perform such duties in the management of the corporation as may be provided in the by-laws, or as determined by a resolution of the board of directors not inconsistent with the bylaws. Ark.Stat.Ann. § 64–310 (1980 Repl.).

With reference to the particular problem of an agricultural cooperative association, state law provides that its bylaws may contain provisions relating to the qualifications, duties, and term or terms of office of directors and officers. Ark.Stat.Ann. § 77–1010(1)(e) (1981 Repl.).

The Co-op's bylaws describe the duties of president as follows: to preside over all stockholders' and directors' meetings; to call special meetings of the stockholders and directors; *to perform all acts and duties usually performed by an executive* and presiding officer; to serve as an ex-officio member of all committees; to sign all stock certificates and other documents which he is authorized to sign by the directors; and all other duties as may be prescribed by the board of directors. (Co-op By-Laws, White's Exhibit No. 4, Article IX, Section 1). (emphasis added). As *Co-op Stores Co. v. Marianna Hotel Co.,* 128 Ark. 196, 201, 193 S.W. 529 (1917), noted: "At the present time the general business of corporations is frequently entrusted to the management of a general manager and it is well recognized that the corporation is bound by the acts of such manager within the apparent scope of his authority." Not surprisingly, the Co-op's by-laws provided that a general manager might be appointed by the board of directors, saying: "The Board of Directors shall have the power to employ ... a Manager ... The Manager shall have the power to employ or dismiss all other personnel.... The Manager shall have *charge of the business of the Co-operative* under the direction of the Board of Directors...." (Co-op By-Laws, Article VII, Section 2). (emphasis added).

Under the Co-op's by-laws, the president is given duties usually performed by an executive officer. At the same time, the Board is *empowered* to employ a manager who is to be given the charge of the business. Arkansas statutes require every corporation to have a president. Ark.Stat. Ann. § 64–310 (1980 Repl.) Arkansas cooperatives, as well, are required to name a president. Ark.Stat.Ann. § 77–1013 (1981 Repl.) It is mandatory to have a president, discretionary to have a general manager. The by-laws of the Farmer's Co-op recognize this distinction, and honor it by empowering but not requiring its board to hire a manager. In the absence of a manager, the president is expected to perform "executive duties." But where a manager is employed, he is given "charge of the business of the Co-operative," *i.e.,* the executive duties of the president.

■ Furthermore, the general corporation laws of the state apply to cooperatives.

Ark.Stat.Ann. § 77–1018. These laws provide that the officers of a corporation shall include a president, vice president, secretary and treasurer, and in addition "such other officers ... as may be deemed necessary may be ... appointed by the board or chosen in such other manner as may be prescribed by the by-laws." Ark.Stat.Ann. § 64–310. Under this analysis, the Co-op may be said to have created the "office" of general manager. That Jack White's position was terminable at the will of the board does not really make a difference in this analysis. The Arkansas corporation law posits that "any officer ... may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby...." Ark.Stat.Ann. § 64–311.

■ In view of the by-laws, though, which gives the general manager charge of the business, it is unnecessary to decide whether White was an officer, because he clearly "performed the duties" of an executive officer. Ark.Stat.Ann. § 67–1256(b). Any general manager given express powers such as White is clearly a person made liable under the blue sky laws. The focus of the statute is directed on those parties directing the affairs of the corporation, or having the power to do so. The general manager of a corporation is recognized not necessarily as being subservient to the elected officers of an entity, but actually in some matters superior to such persons. As the court in *Streett v. Laclede-Christy Company*, 409 S.W.2d 691, 694 (Mo.1966), noted: "The office of general manager is of broader import than that of president. The fact that a person having an active conduct of the business of a corporation is also its president does not operate as a limitation on the powers usually exercised by its general agents or managers...." It has been said that a general manager may be considered as virtually the corporation itself. *Sealy Oil Mill & Mfg. Co. v. Bishop Mfg. Co.*, 235 S.W. 850, 852 (Tex.1921).

The affidavit submitted by plaintiffs affirmed that White exercised day-to-day control of the business affairs of the Co-op.

(Declar. Sandra Robb, Ex. 2, ¶ 2). White neither denied that he worked as general manager, nor that he exercised day-to-day control of its officers. He never denied being in "charge of the business of the Co-operative," which certainly included attracting investment and capital. By any fair reading of the record, he and the directors were the parties most in charge and responsible for the demand note program. Consequently, we find that while he may technically not be a corporate officer, he performed the duties of an executive officer of a corporation, and is liable under the statute.

■ The situation is otherwise with respect to Goradia. He is described as an "office manager" or "controller." The by-laws define no such positions or officer. We are unable to say that he performed the duties of "secretary-treasurer" since the record is spare or silent on the question. It appears that he was hired by White, rather than by the Board, so he lacks even that indicia of officialdom within the Co-operative.

His liability, then, is that of an employee who "materially aids" in the sale of securities. To this end, the plaintiffs have shown that Goradia helped set the interest rate on the demand notes, that he signed some notes, and that he answered questions about the program, being listed as a member of the Co-op team from whom patrons could obtain information about the investment opportunity.

For all practical purposes, the material facts are admitted; Goradia does dispute being a "comptroller" and also disputes the characterization of his acts in aid of the sale of securities. What is subject to dispute are the inferences to be drawn from admitted facts. If the court were the jury, it would have little difficulty in reaching the conclusion that Goradia materially aided in the sale of securities.

This court is prepared to believe, for example, that one who participates in deciding the rate of return for a security probably does aid in the sale of the instrument. But if such an act is purely ministerial,

such as by adding a given number of points to the federal discount rate, then can one not disagree about the materiality of the assistance?

The court wishes to emphasize that it agrees with the policy of the Rules which holds that summary judgment is to be withheld unless there is no genuine dispute as to any material fact, and, furthermore, the inference to be drawn from those facts is not subject to dispute. *Redna Marine Corp. v. Poland,* 46 F.R.D. 81, 85 (S.D.N.Y. 1969). Summary judgment is to be granted only in "very clear" cases. *U.S. v. Lein,* 352 F.Supp. 120 (D.Minn.1972). No matter how reasonable, a surmise that a party is unlikely to prevail at trial is not a sufficient basis for refusing him his day in court. *Union Transfer Co. v. Riss & Co.,* 218 F.2d 553 (8th Cir.1955). Because reasonable minds may differ on the question whether Goradia's acts materially aided the sale of any demand notes, the court feels that summary judgment is inappropriate against him.

### D. Miscellaneous Issues

Plaintiffs have asked that the defendants be charged under the Oklahoma Blue Sky statutes. Oklahoma exempts from regulation securities issued by a cooperative organized under the laws of Oklahoma. While it is true that the Farmer's Co-op was not organized under the laws of Oklahoma, it was domesticated in Oklahoma as of April 26, 1978. The Business Corporation Act of Oklahoma, Title 18, § 1.199 d, provides that a foreign corporation, once domesticated in Oklahoma, enjoys the same rights and privileges of an Oklahoma corporation. We construe this to mean, *inter alia,* that a foreign corporation's securities will be exempt from regulation if the securities of a domestic corporation of the same kind would be exempt. To the extent that liability exists, it must be found under Arkansas law. At one time, Arkansas's securities statutes had extraterritorial "reach," covering even those securities sold in Oklahoma. Then, by Act 836 of 1983, Arkansas permitted the sale of unregistered securities in other states if they would be legal in that jurisdiction. *See* present Ark.Stat.Ann. § 67–1260(c).

Finally, plaintiffs have asked us to construe the Arkansas statutes so that every monthly addition of interest constitutes a new "issue" of a security. We are not prepared to do so at this time, and await further argument on this point by the parties. First, the statute establishing civil liability says that a defendant is "liable to the person buying the security from him, who may sue at law or equity to recover the consideration *paid* for the security, together with interest at six percent [6%] per year *from the date of payment....*" Ark. Stat.Ann. § 67–1256(a)(2). Furthermore, the statute imposes a limitation period as follows: "No person may sue under this Section after five years from the *effective date of the contract of sale.*" Ark.Stat. Ann. § 67–1256(e). The court seriously doubts that the General Assembly meant that in the case of securities which operated like a bank account, the investor should recover what he has paid *and* earned, *plus* six percent, on the theory that he "paid" what he earned by passively allowing the interest to be added to his account. The language in the limitations subsection refers to the "effective *date* of the contract of sale." Common-sensically, we interpret this at first blush to mean the initial payment, and subsequent active purchases by the investor. We do not think that, for example, if the Co-op had offered an unregistered security in year 1, corrected its mistake in year 4, it should be liable for its initial mistake in year 9 because a particular investor continued to "credit interest" to his account before the Co-op obtained a valid registration or exemption.

It is unnecessary to decide this point at this time. Summary judgment will be granted to plaintiffs against Jack White and the directors for all demand notes purchased after April 5, 1980, until October 28, 1983, plus six percent (6%) interest, with fees and costs to be determined. Summary judgment is withheld with respect to any notes purchased before April 5, 1980, but subject to "reinvestment" pending further

submissions on this point. Summary judgment is denied with respect to defendant Goradia.

An order summarizing these findings will be issued contemporaneously herewith.